# Exhibit A



**INTERNATIONAL COURT OF ARBITRATION®** | **INTERNATIONAL CENTRE FOR ADR** | LEADING DISPUTE RESOLUTION WORLDWIDE

# AWARD

**INTERNATIONAL CHAMBER OF COMMERCE (ICC)**
**INTERNATIONAL COURT OF ARBITRATION**

33-43 avenue du Président Wilson, 75116 Paris, France
**T** +33 (0)1 49 53 29 05  **F** +33 (0)1 49 53 29 33
**E** arb@iccwbo.org   www.iccarbitration.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 19574/GFG

PETRO-CHEM DEVELOPMENT CO.; INC

(U.S.A.)

**vs/**

**1.** PANGANG GROUP INTERNATIONAL ECONOMIC & TRADING CO. LTD.

(China P.R.)

**2.** PANGANG GROUP CHONGQING TITANIUM INDUSTRY CO. LTD.

(China P.R.)

This document is an original of the final award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

**IN THE MATTER OF AN ARBITRATION UNDER THE RULES
OF ARBITRATION OF THE INTERNATIONAL CHAMBER OF COMMERCE**

**CASE NO. 19574/GFG**

between

**PETRO-CHEM DEVELOPMENT CO., INC**

**(U.S.A.)**

Claimant

and

**1. PANGANG GROUP INTERNATIONAL ECONOMIC & TRADING CO. LTD.**

**(China P.R.)**

**2. PANGANG GROUP CHONGQING TITANIUM INDUSTRY CO. LTD.**

**(China P.R.)**

Respondents

# FINAL AWARD

12 December 2014

BEFORE
Sigvard Jarvin, JDr
Christopher Moger QC
Alexander Foerster, President

# TABLE OF CONTENTS

I.  Introduction ................................................................................. 6
    A.  The Parties ......................................................................... 6
    A.1 Claimant ............................................................................ 6
    A.2 Respondents ...................................................................... 6
    B.  The Arbitral Tribunal ....................................................... 7
    C.  The Dispute ....................................................................... 9
    D.  The Seat of Arbitration .................................................... 9
    E.  The Applicable Procedural Rules .................................... 10
    F.  The Language of the Arbitration ..................................... 11
    G.  Applicable Substantive Law ........................................... 11
II. History of the Arbitral Proceedings ....................................... 12
    A.  Proceedings related to the Merits of the Case ............... 12
    B.  Proceedings related to Claimant's Application for Conservatory and Interim Measures ................................ 22
    C.  Claimant's Application for Production of Documents .... 24
    D.  Claimant's Reservation regarding its Right to be Heard .... 24
III. The Parties' Prayers for Relief ............................................. 27
    A.  Claimant ........................................................................... 27
    B.  Respondents ..................................................................... 27
IV. The Background of the Dispute ............................................. 28
    A.  The Contracts ................................................................... 28
    B.  The US Proceedings against Mr Liew and USAPTI ....... 29
    C.  Request for Adequate Assurance .................................... 31
    D.  The Call of the Bank Guarantees ................................... 34
V.  The Parties' Positions on the Merits and the Arbitral Tribunal's Findings ...... 36
    A.  Development of the Claimant's Position ......................... 36
    B.  Summary of Claimant's Final Position ........................... 40
    C.  Breach of Duty of Good Faith ......................................... 40
    D.  Claimant's Right to Suspend Delivery ............................ 45
    E.  Respondents' Breach of Contract .................................... 50
    F.  Summary of Claimant's Claim for Damages ................... 55
    G.  Respondents' Counterclaim ............................................ 55
VI. Costs ...................................................................................... 59

A.   Costs of the Arbitration fixed by the ICC Court ...................................... 59

B.   Claimant's Cost Claim .......................................................................... 59

C.   Respondents' Cost Claim....................................................................... 61

D.   The Arbitral Tribunal's Findings .......................................................... 61

VII.   Award ............................................................................................................. 65

## ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| ACE | ACE – Auditeurs et Conseils d'Entreprise - ACE Group, Forensic Accounting Review Report of 13 April 2014, submitted as exhibit CEWS.3 |
| Answer to the Request | Respondents' Answer to the Request for Arbitration |
| Application | Claimant's formal application requesting conservatory and interim measures pursuant to Article 28(1) of the ICC Rules of 22 November 2013 |
| Arbitral Tribunal | The arbitral tribunal appointed in the ICC CASE NO. 19574/GFG |
| CISG | United Nations Convention on the International Sale of Goods |
| Claimant | Petro-Chem Development Co., Inc. |
| Contracts | Contract No.:10USSCZ32PGCQ25 for TiCL4 Fluid differential Temperature Processing Unit and Contract No.:10USSCZ32PGCQ26 for O2 Fluid differential Temperature Processing Unit, both dated 22 August 2010 (submitted as Exhibit 1 to Claimant's Request and C-4 to the SoC) |
| Court | International Court of Arbitration of the International Chamber of Commerce |
| DuPont | E.I. du Pont de Nemours & Company |
| DOJ | US Department of Justice |
| FBI | US Federal Bureau of Investigation |
| Hearing | The hearing in this arbitration which took place during week 37 between 8-11 September 2014 in Stockholm |
| Heaters | The technical equipment as defined in Article 1.3 of the Contracts |
| Heurtey | Heurtey Petrochem S.A., Claimant's parent company |
| IBA Rules | IBA Rules on the Taking of Evidence in International Arbitration in force as of May 2010 |

| ICC Rules | Rules of Arbitration of the International Chamber of Commerce in force as of 1 January 2012 |
|---|---|
| Memorandum | Claimant's memorandum of 4 September 2014 |
| Petro-Chem | Petro-Chem Development Co., Inc., Claimant |
| PIETC | Pangang Group International Economic & Trading Co., Ltd. (Respondent 1) |
| PO | Procedural Order |
| President | President of the Arbitral Tribunal |
| Rejoinder | Respondents' Statement of Rejoinder |
| Reply | Claimant's Statement of Reply |
| Request | Claimant's Request for Arbitration |
| Respondents | Respondent 1 and Respondent 2 |
| Respondent 1 | Pangang Group International Economic & Trading Co., Ltd. |
| Respondent 2 | Pangang Group Chongqing Titanium Industry Co., Ltd. |
| Secretariat | Secretariat of the International Court of Arbitration of the International Chamber of Commerce |
| Secretary General | Secretary General of the International Chamber of Commerce |
| SoC | Claimant's Statement of Claim |
| SoD | Respondents' Statement of Defence |
| T | Transcripts of the Oral Hearing which took place from 08 to 11 September 2014 |
| UCC | Uniform Commercial Code of the United States of America |
| USAPTI | USA Performance Technology, Inc., 1300 Clay Street, Suite 600, Oakland, CA 94612, U.S.A Respondents contract partner responsible for process engineering and design for the 100,000 MTPY TiO2 by Chloride Process plant |

| I. | Introduction |
|---|---|
| A. | The Parties |
| A.1 | Claimant |

1.   **PETRO-CHEM DEVELOPMENT CO., INC,** a company incorporated under the laws of the State of Delaware, United States of America and with headquarters at no. 122 East 42nd Street, Suite 2308, New York 10168 USA ("**Claimant**").

2.   Claimant is represented in this arbitration by

   **Mr Patrick Marès**

   FLEURY MARES DELVOLVE ROUCHE

   1-3 rue Caumartin

   75009 PARIS/FRANCE

   Tel: +33 1 42 27 33 82

   Fax: +33 1 47 63 15 19

   E-mail: pmares@fleurymares.com

| A.2 | Respondents |
|---|---|

3.   **(1) PANGANG GROUP INTERNATIONAL ECONOMIC & TRADING CO. LTD.,** a company incorporated under the laws of the People's Republic of China with its headquarters at no. 266 Shawan Road, Jinniu District, Chengdu, Sichuan 610031, P.R. CHINA ("**Respondent 1**");

   **(2) PANGANG GROUP CHONGQING TITANIUM INDUSTRY CO. LTD.,** a company incorporated under the laws of the People's Republic of China with its headquarters at 51 Zouma Ercun, Banan District, Chongqing, Sichuan 400055, P.R. CHINA ("**Respondent 2**").

Nothing of importance turns on the distinction between the two Respondents in this case and neither side made any real distinction between them at any stage of the arbitration. For that reason they will generally be referred to as "**Respondents**" (plural) in this award although the Arbitral Tribunal is conscious of the fact that they had different roles under the Contracts and that most, if not all, of the correspondence between the Parties was between the Claimants and Respondent 1 as the dispute developed.

4.     Respondents are represented in this arbitration by

**Ms Ge Yan**

King & Wood Mallesons
20th Floor, East Tower, World Financial Center
1 Dongsanhuan Zhonglu, Chaoyang District
Beijing, 100020, P.R. CHINA

Tel: +86 10 58 78 55 88 ext 5122
Fax: +86 10 58 78 55 66
E-mail: geyan@cn.kwm.com

and

**Mr Philip Edey QC**

20 Essex Street,
London WC2R 3AL
UNITED KINGDOM
E-mail: pedey@20essexst.com

## B.     The Arbitral Tribunal

5.     The Arbitral Tribunal is composed of:

(i)     Mr Sigvard Jarvin, JDr
        81 Avenue Simon Bolivar
        75019 Paris
        FRANCE

Tel: +33 1 40 03 83 27
Mobile +33 6 14 86 50 01
E-mail: jarvinarb@orange.fr

(Nominated by Claimant)

(ii)   Mr Christopher Moger QC
       4 Pump Court

       Temple
       London EC4Y 7AN
       UNITED KINGDOM

       Tel: +44 207 842 5555
       E-mail: cmoger@4pumpcourt.com

       (Nominated by Respondents)

(iii)  Mr Alexander Foerster
       MANNHEIMER SWARTLING
       Bockenheimer Landstrasse 51-53
       60325 Frankfurt am Main
       GERMANY

       Tel: +49 69 97 40 12 21
       Fax: +49 69 97 40 12 10
       E-mail: afo@msa.se

       (appointed upon proposal of the German National Committee as
       president of the Arbitral Tribunal (the "**President**") by the International
       Court of Arbitration of the International Chamber of Commerce (the
       "**Court**"))

6.     On 18 September 2013, the Secretary General of the International Chamber
       of Commerce (the "**Secretary General**") confirmed, pursuant to Article
       13(2) of the Rules of Arbitration of the International Chamber of Commerce
       in force as of 1 January 2012 (the "**ICC Rules**"), Mr Sigvard Jarvin, JDr as
       co-arbitrator upon Claimant's nomination, and Mr Christopher Moger QC as
       co-arbitrator upon Respondents' joint nomination.

7.      On 4 October 2013, the Secretary General confirmed upon proposal of the German National Committee, pursuant to Articles 12(5) and 13(2) of the ICC Rules, Mr Alexander Foerster as President of the Arbitral Tribunal.

## C.      The Dispute

8.      On 22 August 2010 the Parties entered into two contracts for the provision of two industrial heaters (the "**Heaters**"). The terms of these contracts were nearly identical and the Heaters were to be used in a production facility in Chongqing, Peoples Republic of China for producing titanium dioxide (TiO2) using a chloride process. Respondents provided certain advance payments in accordance with an agreed payment plan against bank guarantees issued by the Bank of China's Paris branch on instruction of Claimant's parent company, HEURTEY PETROCHEM ("**Heurtey**"). Claimant started production of the Heaters but never supplied them to Respondents. The main reason was the following: Since Claimant had been warned that the technical concept for the envisaged production facilities (but not the technology in respect of the Heaters themselves) was dependent on confidential knowhow of the US company E.I. DU PONT DE NEMOURS ("**DuPont**") which had allegedly been misappropriated and that Claimant's delivery of the Heaters might infringe upon DuPont's rights, Claimant requested adequate assurance from Respondents that there would be no risk of civil and criminal liability to Claimant for the delivery. The Respondents could not give the requested assurance and therefore Claimant indicated that it would suspend delivery. Respondents called the bank guarantees and finally received the amount paid as advance payment. Claimant claims damages for Respondents' breach of contract.

## D.      The Seat of Arbitration

9.      Claimant based its claims on the Contract No.:10USSCZ32PGCQ25 for TiCL4 Fluid differential Temperature Processing Unit and on Contract No.:10USSCZ32PGCQ26 for O2 Fluid differential Temperature Processing Unit, both dated 22 August 2010 (submitted as Exhibit 1 to Claimant's

Request and C-4 to the SoC) (the "**Contracts**"). The arbitration clauses included in chapter 13 of each contract states the following:

> *13.1 All disputes arising from the execution of the present Contract shall be settled through friendly consultation between both parties. In case no agreement can be reached through consultation, the disputes shall be submitted to arbitration.*

> *13.2 The arbitration shall take place in Stockholm, Sweden, and be performed in accordance with the arbitration procedure and rules of the International Chamber of Commerce. The committee of Arbitration shall be formed by 3 members appointed in accordance with the said Rules. The arbitration shall be carried out in Swedish.*

> *13.3 The law applicable to the arbitration shall be decided by the arbitration committee.*

> *13.4 The arbitration award shall be final and binding on both parties.*

> *13.5 The arbitration fee and other expenses shall be borne by the losing party unless the arbitration committee rules otherwise.*

> *13.6 In the course of arbitration both parties shall continue to execute the present Contract except those matters under arbitration."*

10.   Thus, according to chapter 13 section 2 of the Contracts the seat of arbitration is Stockholm, Sweden.

## E.   The Applicable Procedural Rules

11.   The arbitration is to be conducted in accordance with the ICC Rules which came into force on 1 January 2012.

12.   There is no power conferred on the Arbitral Tribunal to act as *amiable compositeur* or to decide *ex aequo et bono.*

13.   In the taking of evidence the Arbitral Tribunal was <u>guided</u> by the IBA Rules on the Taking of Evidence in International Arbitration in force as of May 2010 (the "**IBA Rules**").

14.   The President was given the authority to sign procedural orders on behalf of the Arbitral Tribunal, provided that prior agreement of the co-arbitrators has been obtained.

## F.   The Language of the Arbitration

15.   The arbitration clause included in chapter 13 of the Contracts provides in section 13.2 for Swedish as the language of the proceedings. However, Claimant in its Request for Arbitration (the "**Request**") suggested that the arbitration be carried out in English (section IV item 49) and in Respondents' Answer to the Request for Arbitration (the "**Answer to the Request**") of 5 August 2013, Respondents agreed to English as the language of the arbitration.

16.   Thus, in the Terms of Reference of 20 December 2013, it was confirmed that the language of the arbitration shall be English. All proceedings were conducted in English and all communications between the Parties and the Arbitral Tribunal was in English. Documents in a language other than the English language, submitted as evidence or otherwise, have been accompanied by an English translation.

## G.   Applicable Substantive Law

17.   The Contracts do not contain any clause determining the law governing the Contracts.

18.   In the beginning of the proceedings Claimant submitted that (i) due to the location for a substantial portion of the negotiations in person and for all telephonic negotiations being New York and (ii) due to the place of performance of the Contracts by Claimant being New York, the laws of the State of New York should be applied.

19.    In response, the Respondents submitted that neither US law nor Chinese law
       should be applied but instead the United Nations Convention in International
       Sales of Goods ("**CISG**").

20.    In the course of the proceeding and prior to the hearing in this arbitration (the
       "**Hearing**") the Parties agreed that the CISG would be the applicable law in
       this dispute. When agreeing to the CISG as applicable law, the Parties – prior
       to the Hearing -  did not argue that there was a need to determine another law
       to the interpretation of the contracts.

## II.    History of the Arbitral Proceedings

## A.    Proceedings related to the Merits of the Case

21.    On 27 June 2013, Claimant submitted a Request for Arbitration to the
       Secretariat of the International Court of Arbitration of the International
       Chamber of Commerce (the "**Secretariat**") pursuant to Article 4 of the ICC
       Rules.

22.    The Request was received by the ICC Secretariat on 28 June 2013, the day
       the arbitration commenced pursuant to Article 4(2) of the ICC Rules, and
       filed under reference No. 19574/GFG. The Claimant was notified of the
       commencement on 1 July 2013.

23.    On 10 July 2013, the ICC Secretariat acknowledged receipt of the filing fee
       and invited the Claimant to nominate a co-arbitrator pursuant to Article 12(4)
       of the ICC Rules. By letter of the same day, the Secretariat notified
       Respondent 1 and Respondent 2 of Claimant's Request and invited the
       Respondents to nominate a co-arbitrator.

24.    By letter of 26 July 2013, Claimant requested an extension of time for
       nomination of a co-arbitrator until the beginning of September whereupon the
       Secretariat, by letter of 31 July 2013, granted a time extension for nominating
       a co-arbitrator until 16 August 2013.

25.    Respondents submitted their Answer to the Request on 5 August 2013.

26. The two Respondents jointly nominated, pursuant to Article 12(6) of the ICC Rules, Mr Christopher Moger QC as co-arbitrator by letter to the Secretariat of 5 August 2013. Respondents further requested that the President of the Arbitral Tribunal appointed by the Court should not be of American, French or Chinese nationality.

27. On 12 August 2013, the Secretariat acknowledged receipt of Respondents' Answer to the Request and notified Claimant of its submission with an enclosed copy.

    The Secretariat invited Claimant to comment on Respondents' requests from 5 August 2013 that (i) the President of the Arbitral Tribunal should not be of American, French or Chinese nationality, (ii) the President be appointed by the Court and (iii) the language of the arbitration should be English.

28. The Secretariat further informed the Parties that, unless they agreed otherwise, the Court, pursuant to Article 13(5) of the ICC Rules, would not appoint an American or Chinese national as President and that the Court would appoint the President of the Arbitral Tribunal pursuant to Article 12(5) of the ICC Rules.

29. Claimant nominated Mr Sigvard Jarvin, JDhc as co-arbitrator via e-mail to the Secretariat on 16 August 2013.Claimant also proposed that the president of the Arbitral Tribunal be jointly nominated by the co-arbitrators.

30. On 19 August 2013, the Secretariat invited Respondents to comment on Claimant's proposal and confirmed English as the language of the arbitration.

31. On 19 August 2013, the Secretariat also informed Claimants via e-mail that the notification of the Request was not successfully delivered to Respondent 2.

32. Respondents did not agree to Claimant's proposal on the nomination of the President by the co-arbitrators. In its letter dated 21 August 2013, insisting on

appointment by the ICC, Respondents again raised the questions of the nationality of the President.

33.     On 26 August 2013, the Secretariat noted that Respondents did not agree with Claimant's proposal that the co-arbitrators nominate the President of the Arbitral Tribunal and also asked Respondents to confirm the Secretariat's understanding that Respondents jointly nominated Mr Christopher Moger QC as co-arbitrator. The Secretariat also enclosed a copy of the statement of acceptance, availability, impartiality and independence of Mr Sigvard Jarvin, JDr as well as his curriculum vitae.

34.     On 29 August 2013, Respondents confirmed their nomination of Mr Christopher Moger QC as co-arbitrator via e-mail.

35.     On 4 September 2013, Claimant confirmed in a letter that the address appearing on the Answer to the Request could be registered as the alternative address for Respondent 2, on condition of assurance that Respondent 2 would not contest the enforceability.

36.     On 9 September 2013, the Secretariat acknowledged receipt of *inter alia* Claimant's correspondence, dated 4 September 2013, and invited Respondents to comment on Claimant's correspondence concerning the registration of an alternative address for Respondent 2.

37.     On 11 September 2013, the Secretariat sent a letter containing a copy of the statement of acceptance, availability, impartiality and independence of Mr Moger QC whom Respondents had jointly nominated as co-arbitrator as well as his curriculum vitae.

38.     On 18 September 2013, the Secretary General confirmed, pursuant to Article 13(2) of the ICC Rules, Mr Sigvard Jarvin, JDr as co-arbitrator upon Claimant's nomination, and Mr Christopher Moger QC as co-arbitrator upon Respondents' joint nomination.

39.     On 3 October 2013, the Court appointed upon proposal of the German
        National Committee Mr Alexander Foerster as President of the Arbitral
        Tribunal upon the German National Committee's proposal pursuant to Article
        13(3) of the ICC Rules.

40.     The file was transmitted to the Arbitral Tribunal on 4 October 2013, pursuant
        to Article 16 of the ICC Rules.

41.     The Arbitral Tribunal proposed a case management telephone conference
        based on a first draft of the Terms of Reference and a draft Procedural Order
        No. 1 to be held between 13-19 November 2013 by e-mail of 30 October
        2013.

42.     On 5 November 2013, Respondents requested by e-mail to postpone the case
        management conference until December due to limited availability of their
        counsel.

43.     Respondents also requested the opportunity to amend their Answer to the
        Request in a letter, dated 5 November 2013.

44.     On 13 November 2013, Claimant wrote in a letter that it was opposed to
        Respondents' requests to postpone the case management conference and to
        the request to amend the Answer to the Request, arguing that it would delay
        the proceedings. In its letter, Claimant also requested the Arbitral Tribunal to
        take a conservatory and interim measure based on Article 28 of the ICC
        Rules.

45.     On 14 November 2013, Respondents submitted response letter responding to
        Claimant's letter, dated 13 November 2013.

46.     On 22 November 2013, Respondents submitted a supplemental Answer to the
        Request for Arbitration and counterclaim.

47.     The case management telephone conference between the Parties and the
        Arbitral Tribunal (Article 24(1) of the ICC Rules) took place on 4 December
        2013, in which the following participated: Patrick Marès of Fleury Marès

Delvolvé Rouche and in-house counsel Anna Perivolaris on behalf of Claimant, Philip Edey QC of 20 Essex Street and Huang Tao of King & Wood Mallesons on behalf of Respondents.

48. On 6 December 2013, the Arbitral Tribunal issued Procedural Order ("**PO**") 1 establishing a provisional procedural timetable pursuant to Article 24(2) of the ICC Rules which dealt with questions on arrangements concerning communications, submissions before the Hearing and evidence in general, documentary evidence, production of documents, witness evidence, Hearing, post-hearing submissions, translation and interpretation and further orders and status of orders.

49. On 6 December 2013, the Arbitral Tribunal also issued PO2 regarding Claimant's request to issue an interim relief according to Article 28(1) of the ICC Rules[1].

50. The Terms of Reference were finalized and sent to the Secretariat via e-mail on 20 December 2013. A copy signed by the parties and the Arbitral Tribunal was sent on 19 February 2014.

51. The Secretariat transmitted the Terms of Reference signed by the Parties and the Arbitral Tribunal on 20 December 2013 to the Court at its session of 27 February 2014, pursuant to Article 23(2) of the ICC Rules.

52. The time limit for transferring had been extended until 28 February 2014 by the Court on its own initiative on 6 December 2013, as communicated by its letters on 6 December 2013 and 9 December 2013.

53. At its session of 27 February 2014, the Court fixed the 31 December 2014 as the time limit for rendering the final award, pursuant to Article 30(1) of the ICC Rules, based upon the procedural timetable established pursuant to Article 24(2) of the ICC Rules.

---

[1] *cf.* Section II B.

54.     Claimant requested to extend the time limit for the Statement of Claim (the
        "**SoC**") in a letter, dated 27 February 2014.

55.     Respondents commented on this by e-mail on 28 February 2014.

56.     On 28 February 2014, the Arbitral Tribunal issued PO3, thereby granting an
        extension of the time limit of one week for the submission of the SoC until 7
        March 2014 and adjusted the procedural timetable accordingly, pursuant to
        Article 24(2) of the ICC Rules.

57.     Claimant submitted its SoC on 7 March 2014.

58.     On 21 March 2014, Respondents submitted a letter claiming that Claimant
        failed (i) to include all referenced evidence and asked the Arbitral Tribunal to
        explicitly confirm that Claimant may not in its further submissions seek to
        introduce or rely on expert evidence from ACE – Auditeurs et Conseils
        d'Entreprise ("**ACE**"), (ii) to serve any factual or expert witness statements
        and asked the Arbitral Tribunal to confirm that Claimant may no longer seek
        to introduce or rely on any factual or expert witness statements and may not
        be entitled to call any oral evidence at the Hearing, (iii) to submit
        documentary evidence in support of all of the items of alleged costs or
        expenses at paragraphs 195–199 of the SoC and asked the Arbitral Tribunal
        to confirm that Claimant may no longer introduce further documents in the
        respect, and (iv) to submit English translations for documents attached to the
        SoC as Exhibits C-47, C-50, C-51 and C-54, and asked the Arbitral Tribunal
        to confirm that these documents did not qualify as evidence.

59.     The Arbitral Tribunal forwarded Respondents' letter to Claimant by e-mail
        on 24 March 2014 asking Claimant for certain clarifications and comments
        and invited Claimant to comment until 28 March 2014.

60.     Claimant answered by a letter, dated 28 March 2014.

61.     The Arbitral Tribunal issued PO4 on 28 March 2014 deciding that (i) it
        would proceed on the basis that Exhibit C-56 contained all the written

evidence on which Claimant intended to rely in support of its financial claims, (ii) it would accept Exhibits C-47, C-50, C-51, C-53, C-54 as written evidence only to the extent they were translated into English, (iii) it took note that Claimant called Mr Reid and Mr Haran to be present at the Hearing and it reserves the question whether the deficient form of Exhibit C-39 and/or C-42 makes them inadmissible as evidence, (iv) it would grant an extraordinary extension for the production of the ACE-Report of two weeks until 13 April 2014 and that the dead line for Respondents' submission of the Statement of Defence ("**SoD**") was 30 May 2014, thereby amending the procedural timetable, pursuant to Article 24(2) of the ICC Rules.

62.     On 13 April 2014, Claimant submitted the ACE-Report as Exhibit CEWS-3.

63.     On 26 May 2014, Respondents applied for an extension by letter for filing the SoD of 10 days, until 9 June 2014.

64.     On 26 May 2014, Claimant declared that it did not object Respondents' request.

65.     The Arbitral Tribunal decided to grant the extension as requested on 29 May 2014 and extended the original deadlines for the Statement of Reply ("**Reply**") and the Statement of Rejoinder ("**Rejoinder**") by five days only. The procedural timetable was to be adjusted as soon as the SoD was received.

66.     Respondents' SoD and counterclaim was submitted on 9 June 2014.

67.     On 25 June 2014, Claimant requested in a letter for an extension of time for the submission of its Reply until 28 July 2014. Claimant submitted (i) that it received the exhibits in paper form only on 12 June, (ii) that it had had no prior opportunity to respond in detail to Respondents' affirmative defences to Claimant's claim which it had had no prior opportunity to review, analyse and respond in detail, and (iii) that it needed more than 20 days to prepare its Reply due to the voluminous exhibits to be studied, analysed and answered.

68.    The Arbitral Tribunal invited Respondents to comment Claimant's request
       until 27 June by e-mail dated 25 June 2014.

69.    On 26 June 2014, Claimant requested Respondents to produce certain
       documents. However, the Claimant's request was denied by the Arbitral
       Tribunal's PO6 (*cf.* chapter C below)

70.    Respondents responded to Claimant's request for extension of the time limit
       in a letter from 27 June 2014 informing the Arbitral Tribunal that
       Respondents did not consent to an extension of time. However, Respondents
       were willing – under certain conditions – to consent to an extension of time
       by 5 calendar days.

71.    On 30 June 2014, Claimant submitted a letter commenting on Respondents'
       letter of 27 June 2014.

72.    On 1 July 2014, the Arbitral Tribunal issued PO5 in which it (i) granted an
       extraordinary extension for the submission of the Reply of five days until 8
       July 2014, (ii) extended the deadline for submission of Respondents'
       Rejoinder to 11 August 2014 and (iii) determined the cut-off date (PO1, para
       17) as 11 August 2014, thereby amending the procedural timetable pursuant
       to Article 24(2) of the ICC Rules. The Arbitral Tribunal also suggested  a
       planning conference on 13 August 2014 via telephone and that the pre-
       hearing conference with the Arbitral Tribunal should take place on 22 August
       2014.

73.    In an e-mail dated 3 July 2014, Claimant (i) reserved its rights with respect to
       the changes of the time limits set by the Arbitral Tribunal and (ii) proposed
       that the planning conference should take place in week 31 (between 28 July
       2014 and 1 August 2014) and the pre-hearing conference should take place
       on either 1 or 2 September 2014 due to restricted availability of Claimant's
       counsel.

74.    Claimant submitted its Reply and defence to counterclaim on 8 July 2014.

75.     With the consent of the Parties the Arbitral Tribunal suggested a planning
        conference to be held on 31 July 2014 and the pre-hearing conference to take
        place on 1 September 2014.

76.     On 31 July 2014, the planning conference of the Parties and the President of
        the Arbitral Tribunal on practical issues was held by telephone, in which the
        following people participated: Patrick Marès and Jean Rouche on behalf of
        Claimant, Ge Yan and Zhang Xiaomin on behalf of Respondents and
        Alexander Foerster for the Arbitral Tribunal.

77.     In the planning conference on 31 July 2014, the President of the Arbitral
        Tribunal proposed the appointment, at no cost to the Parties, of Ms Ricarda
        Fahrbach as Administrative Secretary to assist the Arbitral Tribunal regarding
        organizational and administrative tasks. The Parties' counsel agreed to this
        proposition.

78.     Respondents' Rejoinder and reply to defence to counterclaim was submitted
        on 11 August 2014.

79.     In an e-mail from 12 August 2014, a declaration of independence and
        impartiality of the proposed Administrative Secretary together with some
        further information about her was sent to the parties. Respondents formally
        confirmed Ms Fahrbach's appointment by e-mail on 13 August 2014 and
        Claimant confirmed her appointment by e-mail on 19 August 2014.

80.     On 22 August 2014, the Arbitral Tribunal informed the Parties that it came to
        the preliminary conclusion that the applicable law to the Contracts is the
        CISG and invited the parties to make clear at the pre-hearing conference on
        1 September on 2014 (i) whether both of them agreed that the CISG applies
        or (ii) whether Claimant maintained its position that US law applies, solely or
        in addition to the CISG.

81.     In a letter, dated 29 August 2014, Respondents provided their observations
        regarding the law applicable to the Contracts.

82.     Claimant answered via e-mail on 29 August 2014, informing the Arbitral
        Tribunal that it would not challenge the Arbitral Tribunal's preliminary
        conclusion and thus that there was no need to hear expert witnesses on US
        law at the Hearing in Stockholm.

83.     On 1 September 2014, the pre-hearing conference took place in the form of a
        telephone conference the minutes of which were provided the same day
        together with the Arbitral Tribunal's PO7 *inter alia* requesting the Parties in a
        written memorandum to identify the legal basis for their respective claims
        identifying, (a) in the case of the Claimant, (i) every Article in the CISG upon
        which it placed reliance as the basis for any of its claims or submissions,
        explaining the relevance of each to its claims and submissions and (ii) each
        relevant provision of US law which the Claimant contended it was required to
        respect and explaining to what aspect of its case that provision of US law is
        relevant and (b) in the case of the Respondents, explaining the legal basis of
        its counterclaim.

84.     Respondents submitted their memorandum on 2 September 2014.

85.     Claimant submitted its memorandum on 4 September 2014 (the
        "**Memorandum**").

86.     Respondents made reservations to Claimant's Memorandum by e-mail on 5
        September 2014 indicating that of the four bases on which Claimant now
        advanced its claim under the CISG, three were completely new as a matter of
        legal analysis.

87.     The Hearing took place during week 37 between 8-11 September 2014 in
        Stockholm in accordance with the agenda agreed on by the Parties. On Day 1
        the parties opening statements were recorded and copies of the recording
        furnished to both parties by the next day. Day 2 (witness testimonies) Day 3
        (Closing Statements) were recorded by transcript and provided to the Arbitral
        Tribunal and the Parties on 19 September 2014.

88.     Written minutes of the Hearing were provided to the Parties and PO8 was
        issued on 17 September 2014.

89.     Cost submissions were submitted by both Parties on 26 September 2014,
        amended by Respondents on 30 September 2014 and commented by each
        opposite party on 3 October 2014.

90.     The closing of the proceedings with respect to the matters to be decided in the
        award was declared on 6 October 2014 and the Secretariat was informed that
        the Arbitral Tribunal expected the draft award to be submitted to the Court
        for approval pursuant to Article 33 of the ICC Rules on 3 November 2014.

## B.      Proceedings related to Claimant's Application for Conservatory and Interim Measures

91.     By letter of 13 November 2013, Claimant requested for conservatory and
        interim measures based on Article 28(1) of the ICC Rules.

92.     Respondents provided their observations in this respect in a letter dated 14
        November 2013.

93.     By e-mail of 15 November 2013, the Arbitral Tribunal informed the Parties
        that its free-standing application under Article 28 of the ICC Rules should be
        submitted by Claimant giving its full reasons and supporting information
        prior to or on 2 December 2013. Thereupon Respondents were invited to
        answer the application no later than 16 December 2013.

94.     On 22 November 2013, Claimant submitted a formal application requesting
        conservatory and interim measures pursuant to Article 28(1) of the ICC Rules
        (the "**Application**") including full reasons and exhibits 25, 26, 27, 28, 29, 30,
        31, 32.

95.     In its Application, Claimant stated that Respondents had called the guarantees
        issued by Bank of China on instruction of Heurtey in favour of Respondents.

96.     Claimant requested the Arbitral Tribunal to order Respondents to withdraw their calls of the guarantees provided Bank of China extended the validity of said guarantees until the outcome of the arbitration.

97.     In parallel, Claimant had also initiated state court proceedings in Paris in order to prevent payment under the guarantees by the Paris branch of the Bank of China. By the time Claimant submitted its request for interim measures, these proceedings were pending before the Paris Court of Appeals, where Claimant's claim was finally rejected on 18 December 2013.

98.     Respondents submitted a first response to Claimant's Application in a letter, dated 25 November 2013, doubting the urgency of such a measure since Claimant had already been well aware that Respondents were seeking payment from the Bank of China under the guarantees when it commenced arbitration on 27 June 2013. They also asked the Arbitral Tribunal not to decide on any measure until Respondents had had a reasonable period of time to present their arguments.

99.     On 26 November 2013, the Arbitral Tribunal sent an e-mail to the Parties inviting them to comment on Claimant's Application and Respondents' letter respectively. Claimant was requested to submit its comments on or before 28 November 2013, including a proposal for an appropriate security to be furnished by Claimant, in the event that the Arbitral Tribunal decided on interim measures, cf. Article 28(1) of the ICC Rules. Respondents were invited to provide observations not later than 2 December 2013.

100.    On 28 November 2013, Claimant further developed its Application in a letter and amended its request.

101.    On 2 December 2013, Respondents submitted an additional response to the Claimant's Application.

102.    On 6 December 2013, the Arbitral Tribunal issued PO 2 on the topic of Claimant's application for interim measures, rejecting the Application on the grounds that it was irreconcilable with Claimant's position in the arbitration

and also that the Arbitral Tribunal had not received a sufficient proposal from Claimant for appropriate security to be provided by Claimant, pursuant to Article 28(1) of the ICC Rules.

### C.  Claimant's Application for Production of Documents

103.   On 26 June 2014, Claimant submitted a request for the production of documents referring to Article E of PO1.

104.   The Arbitral Tribunal issued PO5 on 1 July 2014 reminding Claimant to use a Redfern Schedule.

105.   On 8 July 2014, Claimant submitted its request for the production of documents using a Redfern Schedule.

106.   Respondents submitted their comments on 15 July 2014.

107.   On 22 July 2014, the Arbitral Tribunal issued PO6, denying Claimant's request for the production of documents.

### D.  Claimant's Reservation regarding its Right to be Heard

108.   At the Hearing the Parties confirmed that they had each had a proper opportunity to present their cases but Claimant reserved its rights regarding the time limits set by PO5 in relation to what it claimed was the inadequate time afforded to it (i) to respond to the opinion of Mr. Oberdier and (ii) to apply to federal court in California for the documents under seal in the Liew/USAPTI trial[2].

109.   Throughout the course of the proceedings, the Arbitral Tribunal had to deal various times with revisions of the procedural time table. Following the case management conference on 4 December 2013, the Parties agreed on the time table as set out in Annex 1 of PO1.

---

[2] T 343-350

110.     According to the original time table, Claimant had to submit its full SoC no later than 28 February 2014 (it thus had 85 days in which to file its SoC). On 27 February 2014, Claimant asked for and was granted an extension of one week to 7 March 2014. However, Claimants did not submit the ACE Report evidencing the amount of its claim for damages at that time, but did so only on 13 April 2014 after the decision of the Arbitral Tribunal from 28 March 2014 (PO4). Claimant thus spent 129 days in total in filing its complete SoC.

111.     According to the revised time table in PO3 Respondents were to submit the SoD by 16 May 2014. In PO4 the Arbitral Tribunal granted an extension for Respondents until 30 May 2014 in order to allow proper response to the ACE Report. Upon Respondents' request of 26 May 2014, the Arbitral Tribunal granted a further extension until 9 June 2014. Respondents thus spent 94 days in filing its complete SoD.

112.     According to PO4 the date set for Claimant to submit its Reply was 27 June 2014 (originally 28 days). In connection with the second extension granted for Respondents' submission of their SoD, on 29 May 2014 Claimant was granted a further extension by 5 days, until 2 July 2014. On 25 June 2014, Claimant asked for an additional extension until 28 July 2014. Respondents in a letter of 30 June 2014 objected to such an extension but agreed to another 5 days extension. In its PO5, the Arbitral Tribunal finally determined the new date for the submission of the Reply to be 8 July 2014. Thus, Claimant had 29 days in which to prepare the Reply.

113.     According to PO4 the date for Respondents' Rejoinder was 25 July 2014 which meant that Respondents originally had 28 days to file the Rejoinder. In an e-mail from 29 May 2014, the Arbitral Tribunal first agreed to an extension of 5 days until 30 July 2014 and in PO5 agreed to an extension until 11 August. Respondents total time to prepare and submit the Rejoinder was thus 34 days.

114.    Following the Pre-Hearing Conference both Parties were granted another 4 days in which to clarify their positions and identify the legal basis for their respective claims.

115.    The Arbitral Tribunal considers that (i) it is Claimant who decides in its own discretion when to start the arbitration and is able to satisfy itself, before it starts, that it has sufficient time to prepare the SoC and information to justify its claims, (ii) the Parties agreed to the original timetable, (iii) according to paragraph 54 PO1 the Arbitral Tribunal may whenever appropriate, modify any procedural order, (iv) Claimant in total was granted more time to submit its SoC and Reply (129 days for the full SoC and 28 days for the Reply) than Respondents were granted to submit their SoD and Rejoinder (94 days for the SoD and 33 days for the Rejoinder) and (v) that Claimant's reservation was made regarding matters of US law, originally raised by it and then subsequently abandoned with the result that they had almost no part to play in the arbitration.

116.    Regarding Claimant's submission that it needed access to certain documents because they were the basis of Mr Liew's guilt and that should further demonstrate Pangang's implication[3] the Arbitral Tribunal finds these documents, if existing, were not of obvious relevance to the issues in the case in any event because Claimant did not allege that Respondents were actually guilty of any offence under US Law. Respondent1 was not even charged with theft or possession of confidential information and the fact that Mr Liew and USAPTI were charged and were convicted was not in dispute. Moreover, it was not Claimant's case that the Heaters contained any misappropriated technology at all.

117.    Consequently, the Arbitral Tribunal holds that Claimant's right to be heard was not affected by the deadlines set in PO5.

---

[3] Claimant's Letter of 26 June 2014

## III. The Parties' Prayers for Relief

### A.        Claimant

118.        Claimant requests the Arbitral Tribunal[4]

119.        (i) to order that Respondents are jointly and severally liable to pay Claimant
            USD 2,991,000 and € 37,224.46 corresponding to the costs, losses and
            damages resulting from Respondents' breach.

120.        (ii) to order that Respondents are jointly and severally liable to pay interest
            on the above amount, at the New York interest rate on judgments (Civ. Prac.
            L. & R. §§ 5003, 5004) until fully paid and with compound interest from the
            date of the claim and with compensation for further damages deriving from
            delayed payment.

121.        (iv) to dismiss all counterclaims brought by Respondents.

122.        (v) to order Respondents "*to pay any and all costs of this arbitration,
            including the Arbitral Tribunal's fees and costs, and such compensation that
            the Arbitral Tribunal shall order to pay in compensation for the expenses,
            legal and others, that the Claimant has to bear in support to the present
            arbitration and its consequences*".

### B.        Respondents

123.        Respondents request the Arbitral Tribunal[5]

124.        (i) to dismiss the claim against them;

125.         (ii) to order Claimant to pay liquidated damages in the amount of $ 358,000;

126.        (iii) to order Claimant to pay compound interest on the above sum;

---

[4] Claimant's Reply, paragraph 170 as confirmed during the Hearing on 08 September 2014.
[5] Respondents' SoD, paragraph 115 as confirmed during the Hearing on 08 September 2014.

127.     (iv) to order Claimant to pay the costs of the arbitration, including, but not limited to, the fees and costs of the Arbitral Tribunal; and

128.     (v) to order Claimant to pay Respondents' legal costs.

## IV. The Background of the Dispute

### A.        The Contracts

129.     In June 2010, Claimant was invited by Respondents to tender for the supply of two industrial heaters for the incorporation of such heaters by Respondents into their construction project relating to a titanium dioxide factory which employs a specific technology made from chlorine compounds[6]. Claimant communicated a technical offer to Respondents on 30 July 2010, relating to the design, fabrication and delivery of the Heaters. On 22 August 2010, the Parties entered into the Contracts for the provision of two industrial heaters.[7]

130.     The contract price for the supply of the TiCl4 heater was USD 2,134,375.00 and for the supply of the O2 heater USD 1,445,625.00.[8]

131.     The original delivery date was expected to be 20 January 2012.[9]

132.     Payment under the Contracts was to be made by Respondent 1 by way of a letter of credit. Further, pursuant to Sections 4.4 and 4.5 of the Contracts Respondent 1 was required to make two advance payments to Claimant of 15% and 10%[10] of the total equipment price under the Contracts, the refund of which was to be secured by way of a bank guarantee.[11] Respondent 1 paid the first advance payment on 21 December 2010.[12] On 25 February 2011,

---

[6] C-9

[7] C-4

[8] C-4 chapter 3 of each contract

[9] The delivery date was dependent of the Contracts coming into force which was 20 October 2011, RWS-1.1 (p.14) delivery was to be made 15 months after the Contracts coming into force (section 5.1 of each contract)

[10] Originally 15 and 10 %, modified by agreement of 29 April 2014.

[11] Refund guarantees were opened on 3 November 2010 by Heurtey covering 15 % payment under each Contract C - 18

[12] R-4

Respondent 1 opened two letters of credit[13] which covered the remaining contract price.[14]

133. The process design underlying the technology to be used in Respondents' facilities was represented to have been developed or acquired by Mr Walter Liew of the company USA Performance Technology Inc. ("**USAPTI**"). Respondents had already in May 2009 concluded an agreement with USAPTI[15] on certain consultancy services. The consulting contract provided that the technology used must be in the complete possession of USAPTI, that USAPTI should be the legal authorized owner of the technology, and, furthermore, that USAPTI's technology did not infringe a third party's intellectual property rights.

134. According to section 1.7 of the Contracts, USAPTI was Respondents' *"counterpart...who is the Buyer's partner ... and who is also executive body in dealing with Seller for the specific performance concerned of the Contract"*.

135. During March 2011, the Parties discussed *inter alia* certain issues in relation to an import license and the approval of drawings and, following a meeting in Chengdu in April 2011, they agreed to postpone the delivery date to 20 May 2012. Furthermore the Parties agreed to amend the Contracts regarding the second advance payment (increasing it from 10% as set in section 4.4 of the Contracts to 15%).[16]

## B.     The US Proceedings against Mr Liew and USAPTI

136. In April 2011, a civil law suit was filed in the US by DuPont against, among others, USAPTI and Mr Liew at the US District Court for the Northern

---

[13] Part A covering the second instalment (10 %, later amended to 15 %) and part B covering the final instalments (75 %, later amended to 70 %)

[14] R-6

[15] R.1 Articles 14.8, 14.11 & R3 10.2

[16] Minutes of meeting C-22 and R-2

District of California.[17] DuPont alleged misappropriation by the defendants to that action of DuPont's proprietary information TiO2 pigment technology. The Respondents were not named as a party to those proceedings.

137.    In July 2011 a delegation to the US from the Respondents' group was subjected to a search of their hotel rooms by FBI agents during a visit to California. Some members of the delegation were detained in the US as witnesses. The Respondents' witness, Mr Zhou Yonggui was in the delegation but was not detained. He returned to China about 5 days after the search. His evidence was that he came to know that the investigation concerned the alleged theft of DuPont's trade secrets at some time after his return to China[18].

138.    Progress of the project was impacted and on 12 December 2011, Respondents informed Claimant about delays in the project and expressed their desire to postpone the delivery of the Heaters and the related payment by 6 months, until 20 November 2012[19]. Claimant, however, did not consent to this postponement[20].

139.    The second advance payment of 15% under both contracts was made by Respondent 1 on 12 January 2012[21].

140.    On 16 January 2012, the Parties met again in Chengdu.[22] At this meeting, Respondents explained that there was a delay in their project. Respondents informed Claimant that (i) DuPont had filed a civil lawsuit against *inter alia* Mr Liew and USAPTI regarding a possible infringement of intellectual property rights of the technology used in the project and that (ii) a delegation of Pangang had also been involved in the investigations of the Federal Bureau

---

[17] C-7
[18] T 121-122: Zhou paragraphs 18 and 19
[19] C-30
[20] C-31
[21] R-5
[22] Minutes of meeting C-34

of Investigation (the "**FBI**")[23] and that (iii) they understood that a criminal case had been filed by DuPont or the FBI against Mr Liew and USAPTI. Respondents said it was their opinion that DuPont might do what it could to prevent the project proceeding and the parties gave consideration to stratagems to avoid DuPont interfering with the Contracts. The outcome of the meeting was, however, confirmation that Claimant would complete its work as early as possible, make shipment of the Heaters and collect payment against the letters of credit. Claimant's understanding, recorded in their note of the meeting, was that Respondents had no intention of walking away from the contract.

141.    On 7 February 2012, a superseding criminal indictment was issued, naming as defendants *inter alia* Respondent 1.[24] In the event Respondent 1 was never validly served with the indictment and the proceedings continued against the other defendants including Mr Liew and USAPTI.

142.    The Wall Street Journal published an article about the indictment on 9 February 2012 and it came to the attention of Mr Limpe of Claimant at that time.[25]

## C.    Request for Adequate Assurance

143.    By letter dated 28 February 2012, Claimant's external legal counsel, Mr Penski of Nixon Peabody, LLP, informed Respondents that "*given the serious nature of the charges against Pangang in the Indictment, and the fact that for nearly one year Pangang has not been candid and forthright with Petro-Chem and has, in fact, seriously misrepresented the truth, Petro-Chem, as Seller under the Contract, has more than reasonable grounds for insecurity under Sections 2-609 of the Uniform Commercial Code. ... See, also, Article 72 of the United Nations Convention on Contracts for the International Sale*

---

[23] A delegation of Pangang to the US was detained and their hotel rooms searched in July 2011, *cf.* RWS-1 paragraph 18 and C-34 at paragraph 7.

[24] C-6

[25] A copy of this article is part of the bundle of press releases submitted as C-58; T-86 Limpe paragraph 19

*of Goods. Petro-Chem therefore demands that Pangang provide Petro-Chem with adequate assurance of performance within thirty (30) days. At a minimum this would include proof of dismissal of the charges in the Indictment against Pangang.*"[26] Claimant also notified Respondents that it "*has suspended production of the two furnaces under the Contract*"[27] ... and said that "*Petro-Chem will not deliver the goods covered by the Contract because basic assumptions of the Contract are no longer valid and Petro-Chem is excused from performance. See, also, Articles 64(1) and 71(1) of the ISOGA (CISG).*"[28]

144.  On 15 March 2012 Respondents replied.[29] They assured Claimant that they would continue to act lawfully. They observed that the Contracts were independent commercial purchasing contracts under which it was obligatory for both parties to fulfil their contractual obligations. They pointed out that they had already made advance payment and had issued letters of credit for the price of the Heaters. They requested Claimant to complete fabrication and make delivery of the Heaters under the Contracts.

145.  On 16 March 2012[30] Mr Lane, general counsel for Claimant, responded. He referred to the UCC and CISG and said that Claimant needed "*to have (Respondents) take affirmative measures to remove any threat of criminal liability to (Claimant) if (Claimant) were to deliver the (Heaters) as originally contemplated under the contracts*". He went on "*you must understand that if (Respondents are) unable to provide such assurances or affirmative measures to shield (Claimant) from potential criminal prosecution, (Claimant) will be unable to perform under the contracts as originally contemplated.*" He concluded "*(Respondents) current options are*

---

[26] Letter of Mr Penski, Nixon Peabody, LLP of 28 February 2012, C-37 second paragraph on page2
[27] Letter of Mr Penski, Nixon Peabody, LLP of 28 February 2012, C-37 fourth paragraph on page 2
[28] Letter of Mr Penski, Nixon Peabody, LLP of 28 February 2012, C-37 third paragraph on page 2
[29] RWS 1.8
[30] RWS 1.9

> *[i] to provide sufficient assurances by March 28 to cure these insecurities or*
> *(ii) to compensate (Claimant)".*

146.    On 27 March 2012[31] Respondents wrote again. They stated that they had
        fully performed their obligations under the Contracts and would continue to
        do so and that there was nothing to show that the indictments would affect
        their ability to perform their obligations. They asserted that the Contracts
        were governed by CISG and that Articles 71 and 72 CISG could not justify
        Claimant's demand for assurances. They demanded that Claimant perform its
        obligation to deliver the Heaters no later than 20 May 2012.

147.    On 6 April 2012[32] Mr Penski of Nixon Peabody, for Claimant, said Claimant
        wanted nothing more than to comply in good faith with its obligations and
        *"would be delighted if (Respondents) can show (Claimant) that the heaters*
        *that are the subject of the Contracts are not now intended and never were*
        *intended to be used at the TiO2 chloride factory that is the subject of the US*
        *federal criminal indictment and the DuPont civil case."*

148.    In mid April 2012, Claimant was summoned to appear and disclose its role in
        the project of building Pangang's TiCl plant in Chongqing/China , its
        technology and its actions before the FBI and the US Department of Justice
        (the **"DOJ"**)[33].

149.    The Parties agreed to meet on 27 June 2012 in Hong Kong having agreed in
        letters, dated 4 June 2012 and 11 June 2012 to postpone the delivery date to
        31 December 2012.[34] The refund guarantees issued by the Bank of China on
        instruction of Heurtey were extended to 15 February 2013[35] as well as the
        letters of credit issued by Respondent 1[36] in order to facilitate further

---

[31] RWS 1.10

[32] RWS-1.11

[33] C-40

[34] C-43(letter of Respondents of 4 June 2012), C-44 (letter of Claimant of 4 June 2012), C-46 (letter of Respondents of 11 June 2012)

[35] C-45

[36] Evidence is not submitted since this fact was never in in dispute

negotiations between the parties. On 27 June 2012, the Parties met in Hong Kong.[37] to further discuss delivery and the impact of the US proceedings.

150.    Mr Limpe attended the meeting and gave evidence for Claimant at the Hearing. From his evidence, and that of Mr Zhou for Respondents, it is clear that the upshot of the meeting was that unless Claimant received the assurances they had previously sought, the Contracts were on *"indefinite hold".*[38]

## D.    The Call of the Bank Guarantees

151.    One month later, on 27 July 2012, Respondent 1 called the bank guarantees on the grounds that Claimant had informed Respondents during the settlement discussions of its refusal to deliver the Heaters.[39]

152.    On 3 August 2012, Heurtey turned to the Commercial Court in Paris and obtained an order on 20 September 2012 against the Bank of China ruling that the bank was forbidden to pay under the guarantees on the grounds that the call for the payment of the above mentioned guarantees was premature, and thus grossly unfair and unlawful (*"manifestemant irrégulier et abusive"*), as they were called before the agreed extension of the delivery date to 31 December 2012[40]. However, the Commercial Court of Paris rejected Heurtey's submission that the demand was improper or impermissible, in particular with reference to Heurtey's complaints relating to the alleged illegality of the underlying Contracts. No appeal was lodged against the decision.[41]

153.    On 31 December 2012, the deadline for Claimant's delivery as agreed in June 2012 expired.

---

[37] SoC para108, SoD para 68
[38] T 94
[39] C-47
[40] Ruling of 20 September 2012 C-51 (French ruling and partial translation)
[41] SoC paragraph 130, SoD paragraph 85

154.    On 8 January 2013, Mr Zhou Younggui of respondent 1 and Mr Long
        Langtao, lawyer and counsellor of Pangang Group Co., Ltd sent a letter
        informing Claimant that *"since PIETC [Respondent 1] has not received the
        equipment from Petro-Chem, nor has it received any information regarding
        any shipment thereof ... PIETC believes that Petro-Chem, by its failure to
        deliver the equipment, has materially breached the Contracts"*.[42] Claimant's
        general counsel Mr Lane answered, in his letter dated 10 January 2013, that
        *"Pangang has provided no new information which changes the situation"*[43].

155.    The Respondents on 17 January 2013 again called for payment under the
        refund guarantees issued by the Bank of China's Paris branch on instruction
        of Heurtey and in favour of Respondent 1.[44]

156.    On 21 March 2013, Heurtey again turned to the Commercial Court in Paris
        to obtain an order preventing the Bank of China from making payment under
        the refund guarantees. By order of 30 May 2013, the court rejected Heurtey's
        application.[45]

157.    Claimant obtained an injunction against the enforcement of the payment
        under the refund guarantees by the enforcement judge of the Paris District
        Court on 13 May 2013.[46] However, this injunction was lifted on 1 October
        2013.[47] Claimant's appeal was rejected by the Paris Court of Appeals on 18
        December 2013.[48]

158.    On 27 June 2013, Claimant had submitted its Request for Arbitration.

---

[42] Letter of Zhou Yonggui and Long Langtao of 8 January 2013 R-9a
[43] Letter of Sean P. Lane of 10 January 2013 R-9b
[44] C-52
[45] C-53 (french ruling and partial translation), R-7 (partial translation)
[46] SoC paragraph 134
[47] By the Enforcement Judge of Paris District Court (Tribunal de Grande Instance de Paris) C-54 (french ruling and partial translation)
[48] R-8 (french ruling and partial translation)

159.   Claimant has produced copies of correspondence, a bank statement and
       transfer receipt[49]. These show that Heurtey's account with the Bank of China,
       Paris branch, was debited in June 2013 with payments amounting to
       US$1,025,059. The documents also show that on 27 January 2014, Heurtey
       received US$1,048,951.15 (after charges of US$26.85) from Claimant *"for
       Pangang Bonds"*. The Tribunal infers that these payments, which are not
       otherwise explained in the evidence, represent reimbursement by Heurtey of
       monies paid by its bank against the guarantees (although the date does not
       appear to match the dates referred to in paragraph 157 above) and subsequent
       reimbursement of Heurtey by Claimant (although the sum paid by each does
       not match). That is Claimant's case.[50]

160.   On 5 March 2014, Mr Liew and USAPTI *(inter alia)* were convicted of
       several of the charges against them by the US District Court for the Northern
       District of California[51].

## V. The Parties' Positions on the Merits and the Arbitral Tribunal's Findings

### A.   Development of the Claimant's Position

161.   Throughout the course of this arbitration, Claimant has developed and varied
       its position several times. In order to better understand the key issues of the
       dispute which were argued at the Hearing, the Arbitral Tribunal will first
       summarize Claimant's submissions.

162.   In its Request, Claimant argued that Respondents were in breach of their pre-
       contractual and contractual duties. Respondents failed to disclose (i) that the
       Contracts concerned misappropriation of DuPont technology,[52] (ii) that
       Respondents[53] might also become the subject of the civil action,[54] and (iii)

---

[49] C-67
[50] Reply 114
[51] C-3
[52] Request paragraph 15
[53] Without indication if Respondent 1 or 2 or both were meant

that Respondents were the subject of criminal investigation.[55] Furthermore, (iv) Respondents did not inform Claimant about the US proceedings against Mr Liew/USAPTI in time[56] and (v) Respondents on two occasions (27 July 2012 and 17 January 2013) acted in a grossly unfair manner and committed gross misconduct by calling two bank guarantees issued by the Bank of China via Heurtey, its parent company.[57] Finally, Claimant also submitted that the Contracts had an illegal purpose and were thus null and void as well as the corresponding bank guarantees.[58] Claimant indicated that it based its claims on Section 2-609 of the Uniform Commercial Code (the "**UCC**"), New York law and alternatively Article 72 CISG.

163.    In its SoC, Claimant again argued that Respondents violated their pre-contractual and contractual duties. However, Claimant then submitted that (i) Claimant was fraudulently induced to enter into the Contracts by Respondents and Mr Liew who knew that the underlying technology was stolen,[59] (ii) that Respondents during the meeting in January 2012 failed the disclose to Claimant[60] (a) that the Contracts concerned the misappropriation of DuPont technology, (b) Respondents might also become the subject of the civil action and that Respondent 1 was the subject of criminal investigation, (c) that Respondents violated their contractual duties by calling of the bank guarantees on 27 July 2012[61] and 17 January 2013.[62] Further, Claimant submitted (iii) that it was impossible to execute Claimant's obligations under the Contracts[63] and (iv) that the Contracts, due to their illegal purpose, were null and void as well as the corresponding bank guarantees[64]. Claimant relied

---

[54] Request paragraph 16
[55] Request paragraph 17
[56] Request paragrapph 17,42,14,18
[57] Request paragraph 29,31,36,37,44
[58] Request paragraph 39
[59] SoC paragraph 116, 145, 146.
[60] SoC paragraph 118
[61] SoC paragraph 108, 110, 121, 128, 145
[62] SoC paragraph 131, 132, 145
[63] SoC paragraph 92, 101, 110, 142
[64] SoC paragraph 115

on Article 1.7 of the Contracts,[65] US law (mainly, the UCC), New York law (without stating exact provisions)[66] and Articles 71 and 72 CISG[67].

164.  In the Reply, Claimant concentrated its arguments on Respondents' breach of contract by saying (i) that they failed to cooperate with Claimant by making it impossible for Claimant to fulfil its contractual obligations[68] (ii) that Respondents failed to inform Claimant about the US proceedings (before, during, and after the January 2012 meeting[69]) and (iii) by calling the bank guarantees[70]. As relevant legal basis for its claim Claimant indicated Article 1.7 of the Contracts[71], the UCC as adopted in New York[72] and the CISG (however without indicating any specific provision)[73].

165.  Subsequent to the Arbitral Tribunal's e-mail from 22 August 2014, Claimant informed the Arbitral Tribunal by e-mail on 29 August 2014 that it would not challenge the Arbitral Tribunal's preliminary conclusion and that the CISG was the applicable law of the Contracts (which Claimant later also confirmed during the course of the Hearing).

166.  As determined during the pre-hearing conference, Claimant provided its memorandum of 4 September 2014 (the "**Memorandum**") identifying the legal basis for its claims. In the Memorandum, Claimant identified 4 claims based on the CISG which, it said, led to its entitlement to damages under Article 74 and to interest under Article 78 CISG. (1) It submitted that Respondents acted contrary to Article 7 CISG and its *"requirement of executing the Contract in good faith"* by (i) not disclosing, prior to entering into the Contracts, that the technology provided by USAPTI was *"not*

---

[65] SoC paragraph 143, 153
[66] SoC paragraph 151-179
[67] SoC paragraph 181-191
[68] Reply paragraph 8, 9, 10, 68, 75, 76, 82, 121, 124, 125, 126, 127, 128
[69] Reply paragraph 84, 85, 126, 133, 168
[70] Reply paragraph 72, 117, 167
[71] Reply paragraph 128
[72] Reply paragraph 135 - 138
[73] Reply paragraph 139 – 142

*available "*[74], (ii) misrepresenting the facts concerning the US proceedings[75] and (iii) calling the bank guarantees.[76] (2) Claimant now relied on Articles 60 *et seq* CISG. Because the project was on hold indefinitely due to Mr Liew's arrest[77] Claimant submitted that Respondents would be in breach of doing what was required of them to enable delivery of the Heaters by Claimant in that in that they were not in a position to enable Claimant to discharge its contractual obligation to assist with the commissioning and start-up of the Heaters. (3) Claimant submitted that it had a right to suspend its performance of the Contracts pursuant to Article 71 CISG for lack of adequate assurances sought by Claimant in and after February 2012 as described in Section C above. Claimant also relied on what it said was Respondents inability to take delivery of the Heaters as justifying its suspension of the Contracts[78]. (4) Finally, Claimant alleged that Respondents wrongfully terminated the Contracts in violation of Article 72 CISG by its July 2012 call on the guarantees. Claimant said its rightful suspension of the contracts did not justify Respondents' termination and, in any event, Respondents did not give notice as required by Article 72[79].

167.   It never was Claimant's case that the technology in the Heaters, the subject of the Contracts, was DuPont's technology, let alone that it was misappropriated technology. Despite ambiguities in the earlier formulation of their claims, this was made clear in paragraph 24 of the Reply.

168.   During the Hearing, Claimant made clear that it did <u>not</u> ask the Arbitral Tribunal to find that any of the Respondents had committed the crimes of which they were accused in the US proceedings nor that the persons representing the companies had actual knowledge that the technology which

---

[74] Memorandum paragraph 4 – By *"not available"* Claimant is taken to mean not lawfully available to USAPTI or Respondents
[75] Memorandum paragraph 4
[76] Memorandum paragraph 4
[77] Memorandum paragraph 5 - 8
[78] Memorandum paragraph 9 - 11
[79] Memorandum paragraph 12 - 17

was to be provided by USAPTI was stolen[80]. Furthermore, Claimant did not ask the Arbitral Tribunal to decide whether Claimant would have committed a civil or criminal wrong if Claimant had performed according with the Contracts. Thus, the Arbitral Tribunal finds that the arguments (i) that the Contracts due to their illegal purpose were null and void and (ii) that Respondents together with Mr Liew fraudulently induced Claimant to enter into the Contracts have been abandoned.[81]

**B.      Summary of Claimant's Final Position**

169.    In its closing statement Claimant finally defined its position and the arguments for its damage claim. It based itself on (i) Respondents' breach of duty to act in good faith pursuant to Article 7(1) CISG, or alternatively from Article 7(2) CISG, and UCC §1-203,[82] (ii) Respondents' breach of contract by terminating the contract on 27 July 2012 without cause and (iii) Claimant's right to compensation based on Article 74 CISG.

**C.      Breach of Duty of Good Faith**

V.C.1    Claimant

170.    Claimant submitted that Article 7 CISG provides for the observance of good faith in the performance of Contracts in international trade.

171.    Claimant argued that the Respondents were in breach in two principal respects: (1) Respondents entered into the Contracts aware of the risk that the technology required for their facility (not for the Heaters) was not lawfully available to them because it belonged to DuPont.[83] (2) Respondents were aware from about July 2011 that Mr Liew and USAPTI were investigated for theft of trade secrets, and that they and their technology would not be

---

[80] T 195 (4-7)
[81] Minutes of Hearing 8 September 2014 p. 3
[82] T 186-187
[83] T 197 and 201

available to the project which would be delayed, but concealed these facts from Claimant during the rest of 2011 and at the meeting of January 2012.[84]

172.    The Arbitral Tribunal also understood Claimant to argue that Respondents wrongfully terminated the Contracts by their unjustified call on the refund guarantees in July 2012 and that they acted in bad faith in doing so because their true, but concealed, motivation in doing so was to *"get rid of"* the Contracts because the Heaters were of no use to them when the project had failed.[85]

173.    Regarding a general duty to observe good faith in an international contractual relation governed by the CISG, Claimant referred to an article of Keily in Vindobona Journal of International Commercial Law and Arbitration, Issue 1 (1999) 15-40, *"Good Faith and the Vienna Convention on Contracts for the International Sale of Goods"* where Claimant found the author supporting the view that Article 7(1) CISG not only requires the observance of good faith in the interpretation of the convention, but also in the interpretation of a contract governed by the convention.[86] However, Claimant did not provide any case law or legal writing supporting his view in this respect.

174.    Claimant, in its closing arguments, also proposed that the duty of good faith follows from Article 7(2) CISG, referring to the principles of private international law, and thus – since the Contracts had been executed in New York – the UCC §1-203 which had to be applied to fill the gap.

V.C.2   Respondents

175.    Respondents submitted first that there is no such freestanding duty of good faith in Article 7 CISG, whether for pre-contractual conduct or the performance of contractual duties. It follows from the literal and historical interpretation of the Convention on Contracts for the International Sale of

---

[84] T 202-208
[85] T 232-233
[86] T 190 (10-13)

Goods that the duty of good faith is to be observed "*in the interpretation of this Convention ...*" only.[87] In this context, Respondents also referred to ICC Arbitration Case No. 8611 of 23 January 1997.

176.   Secondly, Respondents submitted that Claimant, by way of Article 7(2) CISG, cannot add duties to the Contracts which are not there. The Article 7(2) argument was only brought into the proceedings during Claimant's closing statement despite the Arbitral Tribunal's PO7. Thus, Claimant is barred from introducing this new argument.[88] Further, Article 7(2) CISG does not operate to introduce, by way of private international law a local law (US law) duty into the Contracts. They said that Article 7(2) applies only to supply a solution by reference to national law in relation to a matter covered, but not expressly dealt with by the CISG. That is not this case. [89]

177.   Even if there had been an argument to introduce a US law principle of good faith there is no such principle under New York law or the UCC which would apply to this case.[90] Furthermore, Article 14.4 of the Contracts (a permitted derogation from CISG by virtue of Article 6) is an "entire contract" clause and prohibits imposing a good faith duty to the parties.[91]

178.   Finally, Respondents argue that there is no breach of any hypothetical duty to disclose[92] and no causational link between any such breaches and the alleged damages.[93]

V.C.3   The Arbitral Tribunal's Findings

179.   The existence of a duty of good faith in a contractual relationship is one of the issues which divides common law from civil law. This issue has also been

---

[87] T 257-259
[88] T 255 (3-10)
[89] T 255-256
[90] T 257 (1-2) and further referring to RWS-2 and RWS-3 (expert opinion of Mr Carl W. Oberdier)
[91] T 260(6-8)
[92] T 265 et subq.
[93] T 264-265

discussed during the negotiations of the CISG.[94] Whereas civil law delegates favoured imposing such a duty upon contracting parties, delegates from the common law countries strongly resisted it. Article 7 of the Convention was the compromise. It states explicitly that "*[i]n the interpretation of this Convention, regard is to be had to... the observance of good faith in international trade.*" The wording itself makes clear that the provision focuses on the interpretation of the convention, not on the interpretation of contracts governed by the Convention. In contrast to the CISG, the 2004 UNIDROIT Principles of International Commercial Contracts, drafted after the CISG, contain a specific provision directed to the parties of an international commercial contract to observe these obligations in good faith in international trade.

180.    It is the Arbitral Tribunal's conclusion that no duty of good faith directed to the parties of a commercial contract can be derived from Article 7(1) CISG since it concerns only the interpretation of the convention. This view is supported by the decision in the ICC Case No. 8611 of 23 January 1997. The Arbitral Tribunal considers that there is a benefit, to those engaged in international trade who may well come from different legal and business cultures, in arriving at an interpretation of the CISG which gives effect to its clear words.

181.    Regarding any alleged duty of good faith following from Article 7(2) CISG and UCC §1-203, the Arbitral Tribunal first refers to its PO7 which was issued subsequent to a pre-hearing conference where the Parties extensively discussed the legal basis for Claimant's claims and the applicable law. Although the parties had already had sufficient opportunity to present their legal arguments, the Arbitral Tribunal granted an additional opportunity to identify the legal basis in the light of the Parties' agreement that the CISG should be the applicable law (see above Section G). In PO7 the Claimant was directed to identify in a Memorandum to be submitted the week prior to the

---

[94] Keily in Vindobona Journal of International Commercial Law and Arbitration, Issue 1 (1999) 15-40, "Good Faith and the Vienna Convention on Contracts for the International Sale of Goods" paragraph 4

Case 1:15-cv-09586-LGS   Document 4-1   Filed 12/08/15   Page 47 of 70

44(66)


Hearing *"(i) every Article in the CISG upon which it places reliance as founding any of its claims or submissions explaining the relevance of each to its claims and submissions and (ii) each relevant provision of US law which the Claimant contends it was required to respect and explaining to what aspect of its case that provision of US law is relevant"*. In the Memorandum, the Claimant mentioned neither Article7(2) CISG nor UCC §1-203.The Arbitral Tribunal has decided that Claimant should not be permitted to advance this argument at such a late stage. It is not fair to Respondents to permit Claimant to ignore the directions of the Arbitral Tribunal and, especially, PO7 in this way.

182.    Nevertheless the Arbitral Tribunal has been able to form a view about the argument. The Arbitral Tribunal finds that Article7(2) CISG introduces rules of international private law only in limited cases. It applies where the subject matter of the dispute is addressed by the CISG and does not operate to "import" a general duty to act in good faith in circumstances where the matter (here delivery) is one expressly dealt with by the CISG but not "expressly settled" by the "general principles" of the CISG. Only in that case one can have recourse to national law. But Article 7(2) CISG is no justification for introducing a "general principle" (good faith) where the CISG does not incorporate it.[95] But in any event Claimant did not submit convincing evidence or arguments as to why US or New York law should be the proper law of the contract nor did it provide sufficient evidence that there would be a duty to act in good faith (and the specifics of it) according to New York law. Based on the Oberdier expert opinion of 11 August 2014[96] the Arbitral Tribunal would have found that there is no duty of good faith under the UCC in this case in any event.

183.    The Arbitral Tribunal also considered Article 14.4 of the Contracts stating that the *"Contract and its Attachments determine exclusively the rights and*

---

[95]  cf. T 255-256
[96]  REWS-3, page 6

*obligations of the Buyer and the Seller for the performance of the Contract itself"*. The arbitral tribunal finds that this clause does not allow Claimant to impose further obligations on Respondent outside the scope of duties laid out in the Contracts. Any duty to disclose information as regards the availability of technical know-how at the time of entering into the Contracts or to disclose information about the availability of USAPTI/Mr Liew at a later stage of the contractual relationship would need to be embedded in a general contractual provision to give rise to any remedy. The conditions of termination of the Contracts are dealt with in chapter 14 of the Contracts as well as by the applicable provisions of the CISG. There is no room for filling of any gaps by a general duty of good faith in this respect either.

## D.      Claimant's Right to Suspend Delivery

184.    Before the Arbitral Tribunal can discuss if, when and for what reasons Respondents have terminated the Contracts and whether Claimant is entitled to claim damages, the question of Claimant's right to suspend its delivery obligation has to be dealt with.

### V.D.1      Claimant

185.    In the letter of Claimant's external counsel Mr Penski of Nixon Peabody of 28 February 2012, Claimant had mentioned for the first time that it would suspend its delivery. The letter stated that *"Petrochem will not deliver the good covered by the Contract because basic assumptions of the Contract are no longer valid and Petrochem is excused from performance."*[97] In this context, Mr Penski referred to Articles 64(1) and 71(1) CISG. He stated his position that adequate assurances would *"at a minimum ... [and] include proof of dismissal of the charges in the Indictment against Pangang."*[98]

---

[97] C-37 page 2, third paragraph at the end
[98] Letter of Mr Penski, Nixon Peabody, LLP of 28 February 2012, C-37 2nd paragraph on page 2

186.     Claimant repeated its request for adequate assurances in a letter of Claimant's
general counsel, Mr Lane, dated 16 March 2012.[99] Mr Lane also mentioned
Article 71 CISG.

187.     In the SoC, Claimant submitted that "*when PANGANG realised that USAPTI
had violated American criminal laws and that such violation affected the
performance of the Contracts ... it should have either (i) given PETRO-
CHEM the requested assurances that it could continue to execute the
Contracts without any risk of being in breach towards DUPONT and
American law or (ii) terminated the Contracts for impossibility and
reasonably indemnified PETRO- CHEM for the consequences of such
termination but under no circumstances should it have forced PETRO-
CHEM, as it did, to perform the Contracts in violation of the laws of the
United States.*"[100] Claimant referred to Article 71 CISG by saying that "*Art.
71 expressly authorizes a seller or a buyer to suspend performance of his
own obligations under the sales contract if it is unlikely to receive the
substantial benefit of the counter-performance promised by the other
party.*"[101]

188.     In its Reply, Claimant clarified that "*[i]t was after Mr Haran confirmed the
risk that Claimant could face if they delivered the Heaters without the
requested adequate assurance and finally suspended the Contract in the
absence of an acceptable response from Respondents*".[102] The affidavit of Mr
Haran of Nixon Peabody was issued on 10 May 2012[103] and it concluded that
there was a risk that Claimant, its officers and its parent company could
become subject to criminal and civil investigations and proceedings.[104]

---

[99] Letter of Mr Lane of 16 March 2012, paragraph 1 on page 2, part of correspondence submitted as C-58
[100] SoC paragraph 156
[101] SoC para 183
[102] Reply paragraph 22
[103] C-42
[104] C-42 paragraph 37

189.     In its Memorandum,[105] Claimant quoted Article 71 CISG without indicating
         whether it primarily relied on Article 71 (a) or (b). Claimant also did not
         develop any suggested criteria for an <u>adequate</u> assurance. Claimant further
         argued that the right to suspension was due to Respondents' inability to take
         delivery as defined in Article 60 CISG[106].

190.     During the opening statement at the Hearing, Claimant repeated these
         arguments but in addition clarified that it based its right to suspension on
         Article 71(b) CISG.[107] During closing statements, Claimant emphasized that
         Respondents did not respond to Claimant's request for assurance at all and
         therefore Claimant was forced to suspend delivery[108] and that Claimant's
         request *was fully reasonable and fully legitimate to suspend the work and to
         say what is the true situation ...*".[109]

V.D.2    <u>Respondents</u>

191.     Respondents from the very beginning submitted that suspension of delivery
         can only be avoided if adequate assurance is provided, but that the assurance
         contemplated by Article 71 CISG is an assurance relating to the performance
         by the debtor of his contractual obligation, that their own performance was
         assured because, upon delivery Claimant could draw upon the letters of credit
         for payment, and finally that Claimant was not entitled to receive the
         assurance requested.[110] Respondents admitted that Claimant had
         communicated its concerns to Respondents but those concerns were
         unjustified and did not excuse the non-performance of Claimant. In their
         Rejoinder, Respondents even clarified that they were in fact not able to
         provide the assurances which were being demanded by Claimant.[111]

---

[105] Memorandum paragraphs 9 - 11
[106] Memorandum paragraph 11
[107] Minutes of Hearing and PO8 page 2
[108] T 201 (3-14)
[109] T 213 (22-25)
[110] SoD paragraphs 103 and 104, Rejoinder paragraph 7
[111] Rejoinder paragraph 12(2)

192.    During the Hearing, Respondents confirmed their position regarding the right to suspension and submitted/explained that they had been open to discuss Claimant's concerns and that they shared information on the US proceedings against Mr Liew and USAPTI with Claimant. Respondents also emphasized that shipment by Claimant constituted delivery under the Contracts and that they would have taken over the Heaters if they had been shipped by Claimant as agreed in the Contracts.

V.D.3    The Arbitral Tribunal's Findings

193.    The purpose of Article 71 CISG is to provide an efficient self-help remedy for an anticipated breach of contract.[112] It enables the creditor to suspend its performance if the fulfilment of a substantial part of the debtor's duties is uncertain, i.e. it protects the creditor from exposing itself to the risk of performing when there is a real prospect of receiving nothing in return for what it has performed. It would have been available in the present contractual relation if it had become apparent to the supplier (Claimant) that the buyer (Respondents) would not be able to deliver technical specifications necessary to build the Heaters or pay the purchase price . In such a situation an assurance could have been demanded of the buyer, which, if given, could have avoided the supplier's suspension of the Contracts.

194.    The situation in the present dispute is different; the issue here is not whether the buyers were able to perform their primary obligation - to pay for the goods - since this was guaranteed through the letter of credit. Claimant primarily submits that there was a risk that its own performance would have negative consequences for itself (namely the risk of becoming involved in criminal investigations or claims by DuPont). Article 71 CISG has no application to such a situation.

195.    Thus, the questions of if, to what extent, and when Respondents acquired knowledge of the investigations and the indictment against Mr Liew,

---

[112] Schlechterim/Fountoulakis, Commentary on the UN Convention on the International Sale of Goods, 3rd ed. 2010 Art.71 note 3

USAPTI or Respondents' own employees are not relevant for this dispute and need not be decided by the Arbitral Tribunal.

196.   Claimant also submitted that it was doubtful whether Respondents could fulfil their obligation to accept delivery of the goods.[113] Claimant made reference to Articles 60 and 61 CISG arguing that the Heaters needed to be assembled and tested on site in China. After the arrest of Mr Liew, Respondents were not in a position to do what was necessary to bring the Heaters into operation.[114] However, at the time, Claimant through its external counsel from Nixon Peabody requested *"adequate assurance"* from Respondents in a letter dated 28 February 2012.[115] The Arbitral Tribunal observes that Claimant must have known that such an assurance was impossible because Respondents had told Claimant on 16 January 2012 of the link between the civil action and the subject of the Contracts. Claimant's obligation to deliver the Heaters had not crystallized. The concerns articulated in that letter clearly concerned the indictment of Mr Liew and USAPTI and the risk for civil liability, not Respondents' ability to take delivery. The assurance sought after in this letter related to the risk that delivery of the Heaters would lead to negative consequences for Claimant, not the risk that Respondents were not able to take delivery.

197.   The same is true for the Hong Kong meeting on 27 June 2012. Prior to that meeting, the Parties wrote letters on 4 June and 11 June 2012 which contained an agreement to postpone the delivery date to 31 December 2012.[116] The delivery did not become due and Claimant's concern continued to be the risk of becoming (more deeply) involved in the criminal investigation and a dispute with DuPont in the event the delivery was actually

---

[113] Memorandum paragraph 11
[114] Memorandum paragraph 5-8 and 11
[115] C-37
[116] C-43(letter of Respondents of 4 June 2012), C-44 (letter of Claimant of 4 June 2012), C-46 (letter of Respondents of 11 June 2012)

performed.[117] It was not the risk that Respondents on or after the due day for delivery would be unable to take delivery.

198.    The Arbitral Tribunal takes the view that, in any event, the residual responsibilities of Respondents to make available competent personnel to assist with the erection and testing of the Heaters under chapter 9 of the Contracts were not related to delivery under chapter 5; were not any, let alone a *"substantial part"*, of Respondents' *"obligations"* within the meaning of Article 71 CISG; and did not expose Claimant to any risks because it would, itself, not be called on to assist in the assembly of the Heaters if that never happened and there was no reason to think it would not have been properly paid if it had been called on. Not only did Claimant not in fact entertain any anxiety about those aspects of the Contracts at the time, it could not have justified invoking Article 71 CISG even if it had done so.

199.    Thus, the Arbitral Tribunal concludes that Claimant had no right to suspend delivery of the Heaters.

## E.    **Respondents' Breach of Contract**

### V.E.1    Claimant

200.    According to Claimant in closing, Respondents' breaches consisted of the following acts and omissions:[118] (i) Respondents misled Claimant after July 2011 and made Claimant believe they had the ability to take the Heaters into operation [119], (ii) Respondents misrepresented the facts regarding USAPTI and Mr Liew's ability to assist Respondents,[120] and (iii) Respondents terminated the Contracts in bad faith by not disclosing the true reason for the termination.[121]

---

[117] RWS-1 (Mr. Zhou) paragraph 30, testimony of Mr. Limpe T 91-94
[118] Deviating from what claimant still submitted during the opening statement, where counsel explained that there were only two breaches, *cf.* Minutes of Hearing and PO8 page 2
[119] T 238:15-23
[120] T 239:4-7;10-16
[121] T 239 :23-25

201.     Claimant submitted that it is entitled to claim damages pursuant to Article 72
         CISG[122] and that the calculation of the damage should follow from Articles
         74 *et seq.* and Article 78 CISG.[123] On 27 July 2012, Respondents had
         terminated the Contracts without cause by calling the bank guarantees issued
         by the Bank of China and renouncing delivery of the Heaters. Respondents
         never gave Claimant reasonable notice of such termination as requested under
         Article 72 CISG.

202.     Since the Parties were in negotiations due to the concerns Claimant had
         presented to Respondents, and the Parties (again) had postponed the delivery
         date, it came as a total surprise to Claimant when it was informed that the
         bank guarantees had been called. Claimant's message to Respondents at the
         meeting in Hong Kong on 27 June 2012 has been clear that it did not want to
         terminate the contract but instead wanted to execute the Contracts subject to
         the provision of an adequate assurance delivered by Respondents. Thus,
         Respondents, by calling the bank guarantees, breached their contractual
         obligation.

203.     In addition, Claimant in its Memorandum mentioned Article 61 CISG as a
         basis for its claim but left it open during the Hearing if this provision would
         still be considered to be applicable.

V.E.2    Respondents

204.     It is Respondents' position that they did not breach the contract as alleged by
         Claimant.

205.     As to the legal basis of the claim, Respondents submitted that Article 72
         CISG solely entitles a party to declare the contract avoided.[124]

---

[122] Memorandum paragraph 12-17
[123] Memorandum paragraph 3
[124] SoD paragraph 104 sub (1) ; Respondents did not submit that Art. 72 CISG does not entitle a party to claim damages. That is submitted regarding Art. 71 CISG only SoD paragraph 103 sub (5)

206.     Furthermore, Respondents position has always been that there is no termination[125] and thus no breach from Respondents' side.

207.     Even if the calling of the bank guarantees in July 2012 were to be deemed a termination it would have been justified because Claimant breached the Contracts by suspending production and delivery of the Heaters without cause.[126] Furthermore, Claimant did not exercise its rights under Article 72 CISG because it did not declare the Contracts avoided.[127]

V.E.3     The Arbitral Tribunal's Findings

V.E.3.1   *Article 72 CISG*

208.     Article 72(1) CISG reads as follows: "*If prior to the date for performance of the contract it is clear that one of the parties will commit a fundamental breach of contract, the other party may declare the contract avoided*".

209.     The Arbitral Tribunal first finds that, as is clear from its wording, this article does not, of itself, justify a claim for damages.

210.     But whether or not any of Respondents' acts or omissions would be considered a fundamental breach Claimant has neither alleged nor proven, that it had declared the Contracts avoided as required by Article 72 CISG. To the contrary, Claimant explicitly stated that it had not terminated the Contracts.[128]

V.E.3.2   *Article 61 CISG*

211.     Articles 60 and 61 CISG were not repeated in Claimant's closing statements but nor was it clear to the Arbitral Tribunal that Claimant had formally abandoned its case based on those articles. Therefore, the Arbitral Tribunal will deal with them briefly. Based on Article 61(1)(b) CISG seller may have a

---

[125] T 304:3-5; 304:22
[126] T 303:1-2
[127] SoD paragraph 104 sub (4) ; T 303: 20-21
[128] Memorandum paragraph 14

claim for damages under Articles 74-77 CISG if a buyer failed to perform any of his obligations under a contract.

212.   Respondents informed Claimant during the meeting in Chengdu on 16 January 2012 about what they knew regarding the US civil and criminal proceedings.[129] Irrespective of the fact that Respondents might have had actual knowledge about these circumstances at an earlier point of time the Arbitral Tribunal cannot see that Claimant breached an obligation under the Contracts by not disclosing that to Claimant prior to that meeting. Nor was there any breach of Article 1.7 of the Contracts. This merely defines USAPTI as the "Counterpart" and stipulates Respondents' liability for all USAPTI's actions and omissions in the performance of the Contracts. Neither Article1.7 nor any other provision of the Contracts contains a duty to disclose information in respect of USAPTI or its officers or of the knowhow of this company.

213.   Furthermore, Claimant did not explain how the lack of information in this respect caused the alleged loss, i.e. the full production costs for the Heaters and cost for the French court proceedings related to the calling of the bank guarantees. The Arbitral Tribunal cannot see any causality between the omission to inform and the alleged loss.

214.   A wrongful termination or a termination without cause may constitute a breach of contract in the meaning of Article 61[130] CISG as it shows that buyer will not perform. Claimant needs to prove that Respondents (i) actually terminated the Contracts by the call of the bank guarantee and (ii) this termination was without cause and consequently a breach of contract.

215.   The Arbitral Tribunal has concluded that Claimant's refusal to complete the Heaters and to deliver them was not justified. It was, itself, an anticipatory

---

[129] C-34

[130] Schlechtriem/Schwenzer/Fountoulakis CISG (German Version) Art. 26 Rn. 6a and Schlechtriem/Schwenzer/Schroeter CISG Art. 25 Rn. 37; Kröll/Mistelis/Perales/Viscasillas/Andrea Björklund CISG, 1 ed. 2011, Art. 25 not. 28-30

fundamental breach of the Contracts by Claimant which Respondents would have been entitled to treat as a ground for avoidance by declaration under Article 72(1) CISG.

216.    But it does not follow that Respondents were bound to treat the Contracts as terminated by that breach. The Arbitral Tribunal must consider whether the Respondents' call on the refund guarantees operated as a declaration of avoidance under Article 26 CISG. According to Article 26 CISG, *a declaration of avoidance* is effective only if it is made with notice to the other party. Article 26 CISG does not impose specific requirements as to the form in which the notice must be made. It can be delivered either in writing or orally.[131]

217.    The call of the bank guarantee in July 2012 was an implementation of Respondents' rights under separate contracts of guarantee. It was not, of itself, inconsistent with the continuation of the Contracts and the Arbitral Tribunal finds nothing in the circumstances in which it was made which can be taken to have been a declaration by Respondents to Claimant that the Contracts themselves were at an end. Nor, in fact, did it have the effect of terminating the Contracts. They continued as amended by the extension of the delivery date after the call. That was, in fact, the basis on which the French Court decided, in favour of Claimant, that the call under the contracts of guarantee was premature[132]. The Tribunal does not find that an ineffective call under the refund guarantees operated as notice to Claimant of avoidance under Article 26 CISG. The Contracts continued in being.

218.    But, even if Respondents by a call of the bank guarantee in July 2012 terminated the Contracts, they would not, thereby, have committed a breach

---

[131] Kröll/Mistelis/Perales Viscasillas/Andrea Björklund, CISG, 1ed. 2011, Art. 26 not.3; The Arbitral Tribunal notices that there also are provisions on formal requirements for communication between the Parties in the Contracts, in particular in Art.14.6 and 14.12 requiring written form, but it is not entirely clear if these provision shall be applied on a declaration made in accordance with Art. 72 and 26 CISG.
[132] C-51, Judgment of Paris Commercial Court of 20 September 2012, p. 8 – p. 9

of contract. As explained a notice of avoidance by Respondents, had it been given, would have been justified.

219.   The Arbitral Tribunal concludes that Respondents did not breach their obligations under the Contracts.

## F.   Summary of Claimant's Claim for Damages

220.   Claimant can neither rely on Article 7 CISG because it does not impose a general duty of good faith on contracting parties nor on Article 72(1) CISG and Article 61(1)(b) CISG. Article 71(1) CISG does not grant the remedy of seeking damages and the application of Article 61(1)(b) CISG failed because there is no breach on Respondents' side and no causality between the alleged breach and the loss. Thus, the Arbitral Tribunal concludes that Claimant has no valid claim for damages.

## G.   Respondents' Counterclaim

V.G.1   Respondents

221.   Respondents submitted that the Contracts are still valid and enforceable. Neither Respondents nor Claimant alleged that they have given notice of termination or a declaration of avoidance to the other Party. However, it is undisputed that Claimant did not deliver the Heaters to the Respondents, including the technical documents.[133]

222.   The amount claimed is the maximum amount permitted under Article 10.9 of the Contracts, i.e. 10% of the contract price, or USD 358,000.[134] Respondents do not need to show the actual loss[135]. Their entitlement is based on the application of the formula for penalties for delayed delivery of the Heaters (Article 10.8.1) and Technical Documentation (Article 10.8.2) having regard to the agreed extended date for delivery of 31 December 2012.

---

[133] SoD paragraph 111
[134] SoD paragraph 112-113
[135] Rejoinder paragraph 33

223.    Regarding Respondents' interest claim, Respondents submitted that one per
        cent over US prime should be applied from the last date of the period over
        which their penalty accrued[136].

V.G.2   Claimant

224.    Claimant's position regarding Respondents' counterclaims is primarily that
        there is no delay since Claimant had a right to suspend its performance and,
        moreover, that Respondents were in breach because they terminated the
        Contracts without cause.[137]

225.    Secondly, Claimant submitted that even under Article 10.8.1 of the Contracts
        Respondents is required to prove actual loss. The purpose of the liquidated
        damages clause is to establish, in advance, a reasonable estimate of damages
        that would be incurred by Respondents in case of breach or delay and not to
        give damages where no damage is proved.[138]

226.    According to Claimant, Respondents were not in the position to take over the
        Heaters and perform an acceptance test. Consequently, Respondents did not
        suffer any loss from the delay.[139]

227.    Claimant repeated that it *"does not categorically refuse to deliver the
        Heaters, it has only suspended performance of the Contract until
        Respondents provide adequate assurances"*[140]

228.    In any event, Respondents have already been compensated by repayment of
        the down payment which they received after the calling of the guarantees.[141]

229.    Claimant did not object to the interest claim as submitted by Respondents.

---

[136] T 340:16-17 and 341: 3-6
[137] T 343:2-3
[138] Reply paragraph 152,153
[139] Reply paragraph 155
[140] Reply paragraph 160
[141] Rreply paragraph 166

V.G.3    The Arbitral Tribunal's Findings

230.    Firstly, the Arbitral Tribunal finds that the wording of Articles 10.8. and 10.9 using the term *"penalty"* is sufficiently clear as not to require Respondents to prove actual loss. In Respondents' submissions, counsel used the term *"liquidated damages"* which in the context of international supply contracts is commonly used to describe a remedy where the purchaser does not need to prove his loss but, on the other side, has a positive effect for seller because it limits seller's liability for delay to a maximum amount. The term *penalty* is synonymously used but is more often found in agreements drafted by US lawyers. In any case, as a matter of principle, no loss has to be evidenced.

231.    The Arbitral Tribunal notes that Respondents have already recovered in full all sums which they prepaid in relation to the Contracts by way of calling the refund guarantees on the very basis that Claimant had not delivered the Heaters by the agreed delivery date. The counterclaim, if allowed, would have the effect of granting them a positive return from Contracts for the supply of equipment for which they have no present use, and which the Arbitral Tribunal finds have been terminated (see further below).

232.    But the Tribunal finds that the contractual provisions on which the Counterclaim is based do not apply in the circumstances of this case. In Article 10.8.1 (relating to the Heaters) the penalty is payable in the case of "late delivery". In 10.8.2 (relating to Technical Documentation) it is payable for "delayed delivery". Respondents say they never terminated the Contracts, so that while they remained in being, delivery could be said to be late or delayed. The Tribunal does not accept this construction of the Contracts. Where, as here, there was no delivery and, moreover, the evidence shows that Respondents would not have accepted late or delayed delivery (see below), it is inappropriate to award liquidated damages under provisions which only apply to late or delayed delivery. That is the end of the Counterclaim.

233.    In the correspondence between the Parties in early January 2013, Respondents stated that they had not received the equipment specified in the

Contracts nor had there been any information regarding their shipment. Respondents concluded their letter of 8 January 2013 by saying that Respondent 1 *"believes that Petro-Chem, by its failure to deliver the equipment, has materially breached the Contracts."*[142] In its answer to Respondent 1's letter, Claimant's general counsel repeated Claimant's position that it would not deliver the Heaters until it received adequate assurance from Respondents.[143] The Arbitral Tribunal finds that non-delivery of the Heaters by the date agreed was a fundamental breach of contract by Claimant who persisted in its unjustified refusal to make delivery.

234.    In the call of the bank guarantee of 17 January 2013 the following message from the Respondents was copied to the issuing bank, the Bank of China's Paris branch: *"However, the seller has not delivered to us the equipment by Dec. 31,2012 and we are not prepared to grant the seller a further time extension to deliver. It is clear that the seller has failed to fulfil its contractual obligations to us and has materially breached the contract."*[144]

235.    Had the Arbitral Tribunal concluded that Articles 10.8.1. and 10.8.2 were capable of applying in a situation of non-delivery, it would have found that the Respondents' letter of 8 January 2013, taken with its communication to the Claimant's parent company's bank (which we are confident is likely to have come promptly to the attention of Claimant) operated as an effective notice to Claimant of Respondents' intention to avoid the Contracts with immediate effect – that is, not later than 17 January 2013.

236.    In those circumstances the Arbitral Tribunal would have held that the Respondents counterclaim was restricted to two weeks (31 December 2012 to 17 January 2013) delay under Article 10.8.1.

237.    Because the technical documents, in accordance with Annex 5 of the Contracts, were not to be delivered before one month after delivery of the

---

[142] R-9a

[143] R-9b

[144] C-52

Heaters no corresponding penalty would have had to be paid because the Contracts were terminated before that month elapsed.

238. But in the light of the Arbitral Tribunal's construction of the Contracts the counterclaim is dismissed.

## VI. Costs

### A.       Costs of the Arbitration fixed by the ICC Court

239. Pursuant to Article 37(1) of the ICC Rules, the Court fixed its administrative expenses in an amount of USD 37,644 and the arbitrators' fees in an amount of USD 247,356 (USD 88,566 for the President and USD 66,424 for each of the co-arbitrators). The expenses incurred by the Arbitral Tribunal amounted in total to USD 25,942.

240. The total costs of the arbitration thus amount to USD285,000.

### B.       Claimant's Cost Claim

241. In its submission of 26 September 2014, Claimant has requested the Arbitral Tribunal to order reimbursement of all its costs borne in the framework of the arbitration procedure and of the French state procedure relating to the call of the guarantees, for a total amount of EUR 320,172.39, USD 607,060.79, GBP 2,599.05 and SEK 180,291.00. The advance on costs charged by the Court was readjusted by decision of 23 October 2014 from USD 135,000 to USD 142,500. Therefore, an amount of USD 7,500 is not contained in the cost claim submitted by Claimant on 26 September 2014.

VI.B.1   Cost Incurred in the Framework of the French Proceedings Concerning the Call of the Guarantees

242. The Claimant considers to be entitled to compensation for all legal fees and costs including those that incurred in the French state proceedings it initiated

in order to prevent Bank of China making payment under the refund guarantees[145].

243.  According to Claimant, it was left with no choice but to initiate proceedings before the French courts, the two calls of the guarantees being the termination of the contracts and the origin of this arbitration. These costs of the French proceedings consist of (i) EUR 67,510.01 of lawyers' fees to Fleury Marès Delvolvé Rouche, Claimant's counsel in this arbitration as well as in the proceedings concerning the call of the guarantees; (ii) USD 132,776.04 of legal fees and costs to Nixon Peabody LLP, who was hired by Claimant to advise on the evolution of the U.S. proceedings against Mr Liew and USAPTI which Claimant deemed to impact the French proceedings regarding the call of the guarantees; (iii) USD 68,000 of fees to Claimant's general counsel, Mr Lane of Kinsale Advisors LLC.

VI.B.2   Costs of the Arbitration

244.  Claimant paid USD 142,500 to the Court as advance on costs. It paid SEK 180,291 for the hearing centre and GBP 2,599.05 for the services of a court reporter.

245.  The legal fees and costs for Claimant's counsel in the arbitration (Fleury Marès Delvolvé Rouche) amount to EUR 200,385.62 plus expenses of EUR 4,356.76, those for Claimant's general counsel Mr Lane of Kinsale Advisors LLC to USD 106,500.00 plus expenses of USD 11,096.14.

246.  Additionally, Claimant seeks reimbursement of legal fees of USD 41,780.55 paid to Mayer Brown and USD 100,730.07 to Nixon Peabody LLP, both of which issued memoranda on different aspects of U.S. civil and criminal law submitted as evidence in this arbitration. The costs and expenses of Claimant's financial expert witness of ACE amount to EUR 37,920.00. Those of its factual witness Mr Limpe to USD 11,177.99.

---

[145] *Cf.* above Chapter IV D

## C.      Respondents' Cost Claim

247.     Respondents have requested in their submissions of 26 September 2014 and
         30 September 2014 full recovery of the incurred costs, being RMB
         2,596,918.57, USD 343,471.40, GBP 215,316.63, SEK 175,565. The advance
         on costs charged by the Court was readjusted by decision of 23 October 2014
         from USD 135,000 to USD 142,500. Therefore, an amount of USD 7,500 is
         not contained in the cost claim submitted by Respondent on 26 September
         2014 and 30 September 2014.

248.     Of these are RMB 2,596,918.57 legal fees and costs of Respondents' counsel
         King & Wood Mallesons, GBP 184,555 of Mr Edey, GBP 24,875 of Mr
         Byam-Cook and GBP 3,288 of Mr Pearce.

249.     The costs for Respondents' legal expert Mr Oberdier amount to USD
         208,471.40.

250.     Respondents also paid USD 142,500 to the Court as advance on costs, SEK
         175,565 for the hearing centre and GBP 2,599.05 for the services of a court
         reporter. Those costs in relation to the management of arbitration procedure
         and Hearing were submitted on 30 September 2014, i.e. after expiration of
         the deadline set out in PO 8.

## D.      The Arbitral Tribunal's Findings

VI.D.1   <u>Cost Incurred in the Framework of the French Proceedings Concerning the
         Call of the Guarantees</u>

251.     Pursuant to Article 37(1) of the ICC Rules the costs of the arbitration shall
         include the fees and expenses of the arbitrators and the ICC administrative
         expenses fixed by the Court as well as the fees and expenses of any experts
         appointed by the Arbitral Tribunal and the reasonable legal and other costs
         incurred by the Parties for the arbitration.

252.     The arbitration agreement reads in 13.5 of the Contracts that "*The arbitration
         fee and other expenses shall be borne by the losing party unless the
         arbitration committee rules otherwise.*" Pursuant to Article 37(1) of the ICC

Rules "*the costs of the arbitration shall include [...] the reasonable legal and other costs <u>incurred by the parties</u> for the arbitration*"(emphasis added).

253.  The proceedings initiated in France relate to the call of the guarantees but not to the arbitration. Although those bank guarantees were opened to secure refund of the total equipment price under the Contracts and therefore provided an opportunity for Respondents to retrieve the money already paid under the Contracts as their main contractual obligation, the refund guarantees constitute separate contracts. Therefore, the costs incurred in proceedings regarding those guarantees are not costs incurred for the arbitration.

254.  Also, the guarantees were opened not by Claimant but by its mother company Heurtey and party to the French state proceedings relating to those was not claimant but Heurtey. Hence, the costs incurred for proceedings relating to the refund guarantees are not costs incurred by the Parties of the arbitration.

VI.D.2   <u>Allocation of Costs</u>

VI.D.2.1  *Generalities*

255.  Each Party requests that it should be awarded compensation for its legal expenses in the arbitration proceedings and both parties submit that the claim of the opposite Party for legal costs shall be rejected.

256.  The Parties did not submit any cost claims after the Court's decision of 23 October 2014 to readjust the advances on costs. However, since the advances on costs are fixed by the Court and pursuant to Article 36(5) of the ICC Rules subject to later readjustment, the Arbitral Tribunal can decide on the allocation of such additional costs without an explicit cost claim having been submitted by the Parties.

257.  In the arbitration agreement, the Parties agreed on a way to allocate the costs by including the following clause 13.5 into the Contracts: "*The arbitration fee and other expenses shall be borne by the losing party unless the arbitration committee rules otherwise.*"

258.    The ICC Rules are silent on the allocation of the costs; Article 37 (4) merely
        states that "*the award shall fix the costs of the arbitration and decide which
        of the parties shall bear them or in what proportion they shall be borne by
        the parties*". Also, pursuant to Article 37 (5) of the ICC Rules, "*the arbitral
        tribunal may take into account such circumstances as it considers relevant,
        including the extent to which each party has conducted the arbitration in an
        expeditious and cost-effective manner*". This permits the arbitrators to use
        their discretion and they do not have to follow the rules or the practice
        applicable in court at the place of arbitration (or any other place, for that
        matter).

259.    There exists a variety of ways of apportioning the costs in ICC arbitrations.
        One is to let costs follow the event and award the winner all his costs[146].
        Another is to make an allocation irrespective of the outcome of the dispute,
        based on other circumstances such as the parties' conduct during the
        arbitration or where the proceedings involve both claims and counterclaims
        making it impracticable to analyse how much of the costs incurred relate to
        the claims and counterclaims[147]. A third approach is to let each party bear its
        own costs. The rationale for the last approach is that it is each party's
        responsibility how it presents and defends its case[148]. Under this theory, each
        party alone decides how much money it disburses on its defence and how
        much time it spends in preparing witnesses and experts, and so forth, without
        imposing on the other party a duty to pay for the party's choice.

260.    After these introductory considerations, the Arbitral Tribunal will now
        examine the Parties' cost claims in light of the circumstances of this case.

---

[146] Emmanuel Jolivet, Chronique de jurisprudence arbitrale de la Chambre de commerce internationale;
Les frais de l'arbitrage, Gazette du Palais no. 2009/4 page 15
[147] Emmanuel Jolivet, ibidem; Michael Bühler, Costs in ICC Arbitration: A Practitioner's View, The
American Review: Essays in Honor of Hans Smit, 1992, page 142
[148] Michael Bühler, op. cit. page 143

VI.D.2.2  *Discussion and Decision*

261.    Claimant's claim for relief in the present arbitration amounts to USD
        2,991,000 plus EUR 37,224. Applying a rate of exchange EUR to USD of
        1.25[149], the Euro amount corresponds to USD 46,530 and Claimant's total
        claim is thus USD 3,037,530. Respondents' counterclaim amounts to USD
        358,000. The proportion between claim and counterclaim is 89% to 11%.

262.    The Arbitral Tribunal rejects both the claim and the counterclaim.
        Percentage-wise the Parties obtain 0% of their respective relief sought. From
        that perspective there is no winner, none of the Parties prevails. Seen from
        the perspective of what the Parties failed to obtain in the arbitration, Claimant
        loses approximately nine times more than Respondents. However, from
        Respondents' perspective faced with a claim of several millions they
        succeeded.

263.    Much time and efforts in the present arbitration have been spent on the issue
        of applicable law and submissions and legal opinions based on US Law.
        Claimant abandoned its position that US and/or New York law applies only at
        the eve of the Hearing in Stockholm. Respondents' costs and fees incurred
        during the arbitration up to that point in order to develop its position under
        US and/or New York law could have been avoided if Claimant had accepted
        at an earlier stage of the arbitration that the CISG applies. Finally, very little
        time and effort were spent on the counterclaim.

264.    The Arbitral Tribunal concludes in this award that Claimant had no right to
        suspend delivery of the Heaters and that Respondents did not breach their
        obligations under the Contracts.

265.    Based on the above considerations, the Arbitral Tribunal decides that
        Claimant shall bear its own costs and that Claimant shall compensate all of
        Respondents' costs, including legal fees and expert fees. In the Tribunal's
        view the sums claimed by the Respondents are all reasonable. Claimant shall

---

[149] Exchange rate on 6 October 2014, the day when proceedings were closed; source: www.oanda.com

bear its share of the advance on costs to the ICC (administrative fee, arbitrators' costs and fees), the hearing centre and the court reporter and shall compensate Respondent outlays in this regard.

266.   Consequently, Claimant shall pay:

(i) RMB 2,596,918.57 (legal fees King & Wood Mallesons);

(ii) USD 350,971.40 (Respondents' advance on costs USD 142,500; fee Mr Oberdier USD 208,471.04);

(iii) GBP 215,316.63 (legal fees Mr Philip Edey QC GBP 184,555, Mr Byam-Cook GBP 24,875, Mr Pierce GBP 3,288, court reporter in Stockholm GBP 2,599.05); and

(iv) SEK 175,565 (hearing centre in Stockholm).

## VII. Award

267.   The Arbitral Tribunal renders the following award:

268.   Claimant's claim for damages is dismissed;

269.   Respondents' counterclaim is dismissed.

270.   Claimant is ordered to bear the costs of the arbitration, including, but not limited to, the fees and costs of the Arbitral Tribunal, amounting in total to USD 285.000 from which Claimant has already paid USD 142,500 and is ordered to pay USD 142,500 to Respondents ; and

271.   Claimant is ordered to reimburse Respondents' legal costs in an amount of RMB 2,596,918.57, USD 208,471.04, GBP 215,316.63, SEK 175,565.

272.   All other claims and requests are rejected.

_____oOo_____

A Party may bring an action before the Stockholm District Court against the Final Award in respect of the fees awarded to the Arbitral Tribunal. Such

action must be brought within three months from the date upon which the Party received the Final Award.

Stockholm 12 December 2014

Sigvard Jarvin, JDr

Christopher Moger QC

Alexander Foerster, President